## Maurice J. McDermott, Jr. v. Merle W. McDermott

[552 A.2d 786]

No. 86-151

Present: Allen, C.J., Peck and Gibson, JJ., and Barney, C.J. (Ret.) and Keyser, J. (Ret.), Specially Assigned

Opinion Filed August 19, 1988

*McKee, Giuliani & Cleveland*, Montpelier, for Plaintiff-Appellant.

*George E. Rice, Jr.* and *Jess T. Schwidde*, Montpelier, for Defendant-Appellee.

**Keyser, J.** (Ret.), Specially Assigned. Plaintiff husband appeals the superior court's property disposition in the underlying divorce action, contending that the court erred in assessing the value of his retirement pension. We reverse and remand.

The parties were married on April 20, 1957, and reared six daughters over the next twenty-eight years. Plaintiff worked as a postal employee during the marriage, and defendant provided day care services. The parties separated on February 2, 1985, and plaintiff filed his complaint on February 6 of that year. At the time of trial, the parties owned a residence with a net equity of $52,000 and a camp with a net equity of $18,500. The only other significant asset was plaintiff's pension fund, in which plaintiff's rights had vested but not yet matured.

The parties agree that their assets, including the pension fund, are marital property and should be divided equally, but they disagree as to the proper method of computing the pension's present value. If, for example, plaintiff had retired as of the date of the divorce hearing, then he would have been entitled to receive a lump sum of $18,500. On the other hand, if he had terminated his employment on the date of the hearing but then waited until March of 1989 (when plaintiff's pension rights would mature) to begin drawing benefits, then the pension would be worth between $36,000 and $66,000 in today's dollars, depending upon the interest rate used in the calculations. Finally, defendant produced expert testimony at trial that the pension's present value was $166,900, based on the following assumptions: that plaintiff would continue to work until March of 1989, that he would retire at age fifty-five, that the interest rate on a comparable annuity would be seven percent, and that this rate should be reduced by a three to four percent cost of living factor. The court adopted the expert's $166,900 figure and awarded defendant $62,000, amortized over a twenty year period, as well as the marital residence.

On appeal, plaintiff argues that the court erred, as a matter of law, in considering his post-divorce employment for purposes of determining the present value of his pension rights. Although we reject this argument in principle, we find error in the method used by the lower court to compute the present value of the benefits attributable to the marriage.

As a threshold matter, we emphasize the parties' agreement that plaintiff's pension rights constitute marital property. Those courts holding retirement pensions to be marital assets have reasoned that such benefits are, in the words of one court, "received in lieu of higher compensation which would otherwise have enhanced either marital assets or the marital standard of living . . . ." *Majauskas* v. *Majauskas,* 61 N.Y.2d 481, 491-92, 463

N.E.2d 15, 20-21, 474 N.Y.S.2d 699, 705 (1984). Retirement pension rights are "the result of direct or indirect efforts expended by one or both parties to the marriage . . . . Each spouse [has] the same expectation of future enjoyment with the knowledge that the pensioner need only survive to receive it." *Kikkert* v. *Kikkert,* 177 N.J. Super. 471, 476-77, 427 A.2d 76, 79, aff'd, 88 N.J. 4, 438 A.2d 317 (1981). Here, for example, plaintiff can greatly enhance the value of the pension by continuing his post-divorce employment until March of 1989, but some of the power to produce this effect was acquired during the twenty-eight years of marriage.

■ Because deferral of benefits is the keynote of most retirement pension plans, disposition of such assets upon divorce is particularly problematic. The courts have used two basic methods to accomplish this task in cases where pension rights are vested but not yet matured: (1) the immediate offset method, and (2) the deferred distribution or reserved jurisdiction method. *Braderman* v. *Braderman,* 339 Pa. Super. 185, 197-98, 488 A.2d 613, 619 (1985); Note, *Vested But Unmatured Pensions as Marital Property: Inherent Valuation, Allocation and Distribution Problems in Equitable Distributions,* 14 Rutgers L.J. 175, 188-89 (1982).

Under the immediate offset approach, the pension benefits are assigned a present value and distributed along with the other marital assets. *Braderman,* 339 Pa. Super. at 197-98, 488 A.2d at 619. The term "offset" denotes the common practice of awarding the undivided pension rights to the employee and awarding other marital property to the employee's spouse. This method is appropriate where other assets are of significant value and where the value of the pension can be assessed without excessive speculation. In this context, the present value of pension rights "is the sum which the person would take *now* in return for giving up the right to receive an unknown number of monthly checks in the future. The present value is discounted by various actuarial calculations to reflect contingencies affecting the eventual payout, including discounts for mortality, inflation, interest, probability of vesting and probability of continued employment." *DuBois* v. *DuBois,* 335 N.W.2d 503, 506 (Minn. 1983). Such estimations are very difficult and can be too conjectural in certain cases. *Bloomer* v. *Bloomer,* 84 Wis. 2d 124, 135, 267 N.W.2d 235, 241 (1978). On the other hand, the immediate offset method promotes immediacy and finality in the disposition, and this route can avoid further entanglement of the parties and problems with continuing

supervision by the court. *Braderman,* 339 Pa. Super. at 198, 488 A.2d at 620.

Alternatively, some courts have chosen to retain jurisdiction and to apportion the pension benefit only when they mature or when payment begins.* *Id.* at 198, 488 A.2d at 619. This method ensures that the parties share the risk of forfeiture through unemployment or death, and it allows the court to base its distribution upon actual figures rather than assumptions as to retirement age and other variables. It also avoids circumstances that would require an unwarranted degree of speculation. Deferred distribution, however, may prolong the strife between the parties because final resolution is delayed. *Id.* at 198-99, 488 A.2d at 620.

Under either of these approaches, the court must determine what portion of the entitlement was acquired during the marriage, and this is accomplished by factoring in the so-called "coverture fraction." See *id.* The numerator of the fraction is the number of months or years that the employee participated in the plan during the marriage, and the denominator is the total number of months or years that the employee will have participated in the plan at retirement. Where the immediate offset method is used, the present value of the benefits is calculated, and this figure is then multiplied by the coverture fraction. The result represents the present value of the benefits attributable to the marriage, and the court distributes the marital property on that basis. Under the deferred distribution method, the coverture fraction is applied to the benefits when they enter pay status. *Id.*

Here, the trial court was within its discretion in electing to employ the immediate offset method; it abused that discretion, however, by failing to factor in the coverture fraction. Instead, the court simply accepted the expert testimony as to present value and proceeded to divide the marital property without acknowledging that portion of the calculated value reflects plaintiff's future earnings. Therefore, we reverse and remand for further computations.

■ Plaintiff also maintains that the trial court erred in accepting the expert's present value calculation because it was based on an annual interest rate of seven percent rather than

---

* At least one court has simply divided the interest in the plan between the parties on a fixed percentage basis, with the apportionment "effective if, as, and when the benefits are received by the retiring spouse." *Dewan* v. *Dewan,* 17 Mass. App. 97, 100-01, 455 N.E.2d 1236, 1239 (1983).

nine percent. Defendant's expert arrived at his valuation by calculating the cost of a hypothetical annuity that would produce the same monthly income as the pension would during retirement. He used a seven percent interest rate despite a stipulation by the parties that an interest rate "of nine percent or slightly better, is available for any relevant time frame between thirty days and twenty years in terms of treasury bill returns." This claim of error highlights the inadequacy of the trial court's findings, which include only limited references to the expert's testimony. No finding addresses the interest rate issue, despite plaintiff's objection at trial and his request for findings. A trial court's findings are not adequate if, upon review, this Court must speculate as to the basis for the decision. *Bonanno* v. *Bonanno,* 148 Vt. 248, 251, 531 A.2d 602, 604 (1987). Upon request of a party, the court is duty bound to make findings upon all the essential issues. See *Prevo* v. *Evarts,* 146 Vt. 216, 218-19, 500 A.2d 227, 228 (1985). Remand for additional findings on the expert's methodology is therefore required.

■ Finally, plaintiff contends that the rate of return used in the calculations should not have been reduced by a cost of living factor. As we have already noted, however, actuarial calculations regarding the present value of a retirement pension properly include discounting for inflation. *DuBois,* 335 N.W.2d at 506.

*Reversed and remanded for further proceedings not inconsistent with this opinion.*