Golden v. Cooper-Ellis (2005-065 & 2005-169)

2007 VT 15

[Filed 02-Mar-2007]


 NOTICE: This opinion is subject to motions for reargument under
 V.R.A.P. 40 as well as formal revision before publication in the Vermont
 Reports. Readers are requested to notify the Reporter of Decisions,
 Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801 of
 any errors in order that corrections may be made before this opinion goes
 to press.


 2007 VT 15

 Nos. 2005-065 & 2005-169


 Jo-Ellen Golden (Cooper-Ellis) Supreme Court

 On Appeal from
 v. Windham Family Court


 Peter Cooper-Ellis February Term, 2006


 Katherine A. Hayes, J.

 Jeremy Dworkin, South Londonderry, for Plaintiff-Appellee and
 Cross-Appellant.

 Bettina V. Buehler of McCarty, Buehler & Bixby, P.C., Brattleboro, and Jill
 Hersh of Hersh Family Law Practice, San Francisco, California, for
 Defendant-Appellant and Cross-Appellee.


 PRESENT: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

 ¶ 1. DOOLEY, J. Husband Peter Cooper-Ellis appeals from both the
 final divorce order dividing the parties' marital estate and orders denying
 his subsequent motion to modify spousal maintenance and child support. 
 Husband makes numerous contentions of error. Most significantly, he claims
 that the family court erred when it included all of his unvested stock
 options in the marital estate. Husband also claims that the court erred in
 its (1) determination of the present value of his unvested stock options at
 the date of trial, (2) division of the assets of the marital estate based
 on outdated valuations, (3) finding that he had an interest attributable to
 the marital estate in a residence he co-owned with his brother, (4) setting
 his maintenance and support obligations on annual income levels contrary to
 previous findings, and (5) denial of his motion to modify the spousal
 maintenance and child support awards. We affirm.
 
 ¶ 2. The parties were married on July 31, 1986, and have three
 children, Molly, Jonathan, and Andrew, born in the marriage. Husband also
 has an adult daughter from a prior marriage, and a baby daughter born to
 his current partner with whom he resides in California. Although the
 determination of the actual date of separation is complicated by the fact
 that husband has been employed in California since 1999 while wife has
 continued to reside in Vermont, the family court found that the parties
 permanently separated, with no attempt to resume married life, in April
 2002. 

 ¶ 3. At the time the parties met and began their marriage, both were
 employed and earning similar salaries. When the children were born, wife
 originally continued working full-time and then worked part-time until the
 spring of 1995 when she remained at home as their primary caregiver. The
 parties' oldest child, Molly, suffers from Smith-Meginis Syndrome, which is
 untreatable. Molly is also diagnosed as mildly retarded, and she has
 difficulty regulating her temper and is physically aggressive. The parties
 have agreed that wife will continue to be Molly's primary caregiver; Molly,
 now eighteen years old, has a normal life-expectancy. Jonathan, now
 seventeen years old, moved to California and resides there with husband. 
 Andrew is thirteen years old and continues to reside with wife in Vermont.

 ¶ 4. Husband lives in California and is currently employed by BEA
 Systems as executive vice-president of engineering. The family court found
 husband's total annual income excluding stock options to be $430,000. 
 Central to this dispute, however, the family court found that a significant
 part of husband's income is provided to him through stock options in his
 employer's company, and the court made findings of the income husband
 receives from the exercise of those options and the value of those options. 
 The court's apportionment of the option shares constitutes the most
 litigated aspect of the divorce. 
 
 ¶ 5. Husband's employer provided him with groups of stock options
 on twenty-three occasions from September 16, 1997 to the end of trial. The
 options are a central, if irregular, part of husband's compensation
 package. The options cannot be exercised immediately. Under the 1997
 stock option plan adopted by the company, which generally applied after
 that date, twenty-five percent of the amount could be exercised at the one
 year anniversary of the date of the grant. At each monthly interval
 thereafter 1/48th of the amount could be exercised until all are accounted
 for at the four year anniversary. All options must be exercised within ten
 years of the date they are granted. For purposes of analysis, we refer to
 options that can be exercised as "vested." 

 ¶ 6. Husband can exercise the options only if he is an employee of
 BEA Systems on the date of exercise. The options consist of both
 nonqualified options, which are transferable, and incentive options, which
 are nontransferable and taxed at a much lower rate than nonqualified
 options. Option exercise prices range from $3.45 per share to $62.13 per
 share. At the time of the divorce hearing, some vested options were
 underwater-that is, the price at which husband could purchase the stock was
 higher than the market value price-so exercising those options would bring
 no benefit. The period remaining for exercise of those options not yet
 exercised ranged at trial from three and one-half years to nearly ten
 years. 

 ¶ 7. As of March 29, 2004, husband had been awarded stock options to
 purchase 953,100 shares of BEA Systems stock and had exercised options as
 to 267,352 of these shares, leaving options for 685,748 shares unexercised. 
 Options for 308,132 of the remaining shares were vested, although many were
 underwater, and husband had between three and one-half and ten years to
 exercise these options depending on when they were granted. The
 rest-options on approximately 375,000 shares-remained unvested. From 2000
 to 2004, husband received nearly $6,000,000 in profit from acquiring the
 stock pursuant to the options. His average annual income from the exercise
 of stock options has been $1,191,838. 
 
 ¶ 8. At the conclusion of the final hearing, the family court
 issued a lengthy order. Ultimately, the court divided the value of the
 marital estate assets equally between the parties. It also set forth a
 child support order and an order for husband to pay wife spousal
 maintenance. The specifics of the contested issues are outlined below. 
 The most contested is the family court's inclusion of all of husband's
 stock options, including the options that had not vested at the time of the
 final hearing, in the marital estate for equitable division.

 I. Stock Options

 ¶ 9. Husband argues that the family court erred in awarding wife
 one-half of his employee stock options that were unvested at the time the
 parties separated. He stipulates that some portion of the unvested options
 may be considered marital property, but argues that the portion that is
 marital property must be attributable to his work during the marriage and
 most of the stock options were awarded for work in the future. He argues
 that the family court should have divided the options according to a "time
 rule" designed to determine what portion of the options can be included in
 the marital estate and what part are his separate property. Additionally,
 he argues that no options awarded after the date of separation should be
 considered marital property.

 A.
 
 ¶ 10. We start with husband's second argument and address whether
 the family court erred by including in the marital estate options acquired
 between the date of the parties' separation and the date of the final
 divorce hearing. The governing statute regarding the distribution of
 marital assets requires that "[a]ll property owned by either or both of the
 parties however and whenever acquired . . . be subject to the jurisdiction
 of the court." 15 V.S.A. § 751(a) (emphasis added). Assets are normally
 valued for distribution as of the day of the final divorce hearing,
 regardless of whether they were acquired during or after the parties
 separated. Hayden v. Hayden, 2003 VT 97, ¶ 8, 176 Vt. 52, 838 A.2d 59;
 see also Nuse v. Nuse, 158 Vt. 637, 638, 601 A.2d 985, 986 (1992) (mem.)
 (upholding court's inclusion of house acquired after separation as marital
 asset subject to division); Bero v. Bero, 134 Vt. 533, 535, 367 A.2d 165,
 167 (1976) (affirming inclusion of tort settlement received after divorce
 was filed as marital asset). Nothing in the statutory wording suggests
 that the court's jurisdiction to divide property of the parties extends
 only to property owned as of the date the parties separated. Thus, the
 family court acted within its discretion in considering stock options
 received by husband after the date of separation and including them in the
 marital estate for division. 

 ¶ 11. Husband's argument on this point is linked to his primary
 argument that the family court should have included as marital property
 only part of the unvested stock options, and that the appropriate cut-off
 date for purposes of an allocation formula is the date of separation. For
 this argument, as well as his larger argument, husband draws from our
 pension cases which have sometimes used the date of separation as a
 temporal dividing line. See, e.g., Russell v. Russell, 157 Vt. 295, 305,
 597 A.2d 798, 804 (1991). Russell is based on the determination in that
 case that the date of separation was the "date . . . most reflective of the
 functional end of marriage." Id. 

 ¶ 12. In Hayden, we explained that Russell dealt with how to
 apportion pension funds, and not the definition of marital property, and in
 any event, set no hard and fast rule. Hayden, 2003 VT 97, ¶¶ 12-13. That
 caution about the use of Russell is particularly applicable here. 
 Apparently because of the overall performance of BEA Systems, the company
 did not award stock options for an extended period, and many of the options
 it had awarded were underwater. In part to make up for these shortfalls,
 it awarded substantial options between the date the family court determined
 that the parties "separated" and the date of dissolution of the marriage. 
 Using the date of separation as a cut-off date would fail to capture as
 marital property a significant part of husband's compensation for the
 marital period. See, e.g., Pascale v. Pascale, 660 A.2d 485, 498 (N.J.
 1995) (stock options awarded after termination of marriage were properly
 included as marital property). We conclude that the family court acted
 within its discretion in determining that the stock options awarded after
 separation were marital property subject to distribution. 
 
 B.

 ¶ 13. The crux of the issue on appeal is the court's treatment of
 husband's unvested stock options, whether acquired before or after the
 parties separated. As we noted above, husband concedes that some part of
 these options may be considered marital property. We agree. Accord In re
 Marriage of Hug, 201 Cal. Rptr. 676, 685 (Ct. App. 1984); In re Marriage of
 Miller, 915 P.2d 1314, 1319 (Colo. 1996); Bornemann v. Bornemann, 752 A.2d
 978, 985 (Conn. 1998); Batra v. Batra, 17 P.3d 889, 894 (Idaho Ct. App.
 2001); Goodwyne v. Goodwyne, 639 So. 2d 1210, 1213 (La. Ct. App. 1994);
 Otley v. Otley, 810 A.2d 1, 6 (Md. Ct. Spec. App. 2002); Baccanti v.
 Morton, 752 N.E.2d 718, 727 (Mass. 2001); Salstrom v. Salstrom, 404 N.W.2d
 848, 850-51 (Minn. Ct. App. 1987); Davidson v. Davidson, 578 N.W.2d 848,
 855 (Neb. 1998); In re Valence, 798 A.2d 35, 39 (N.H. 2002); Callahan v.
 Callahan, 361 A.2d 561, 563 (N.J. Super. Ct. Ch. Div.1976); Garcia v.
 Mayer, 920 P.2d 522, 525 (N.M. Ct. App. 1996); DeJesus v. DeJesus, 687
 N.E.2d 1319, 1323 (N.Y. 1997); Fisher v. Fisher, 769 A.2d 1165, 1169 (Pa.
 2001); Bodin v. Bodin, 955 S.W.2d 380, 381 (Tex. Ct. App. 1997); In re
 Marriage of Short, 890 P.2d 12, 15 (Wash. 1995) (en banc); Chen v. Chen,
 416 N.W.2d 661, 663 (Wis. Ct. App. 1987), review denied, 419 N.W.2d 562
 (Wis. 1988). But see Hann v. Hann, 655 N.E.2d 566, 569 (Ind. Ct. App.
 1995); Hall v. Hall, 363 S.E.2d 189, 195-96 (N.C. Ct. App. 1987); Ettinger
 v. Ettinger, 637 P.2d 63, 65 (Okla. 1981). Unlike the family court,
 however, husband takes the position that some of the unvested options were
 given as compensation for future work to occur after the dissolution of the
 marriage, and these options cannot be considered part of the marital
 estate. In making this argument, he draws on two sources in particular-the
 factual record as to the purpose of the stock options, and our treatment of
 employee pensions as part of marital property-as well as decisions from
 other states. We first turn to his sources for his argument.
 
 ¶ 14. There is no question that as an upper level executive,
 husband received stock options as part of his basic compensation package,
 and the family court so found. The court summarized the evidence on the
 purposes of the stock option plan as follows:

 [I]n granting stock options to employees, employers have many
 goals. They seek to retain employees whose work they value; they
 seek to align the employees' interests with those of shareholders
 in the company; they seek to motivate the employee to perform
 better in the future; and they seek to give the employee the
 incentive to stay. These purposes are overlapping and
 inextricably entwined. . . .
 Jeanne Wu, a senior vice-president for human resources at
 BEA, testified that . . . such options are used to reward employees 
 for performance, and to retain them for the future. . . . 

 The [BEA] . . . compensation committee report confirmed that:
 "Because of the direct relationship between the value of an option
 and the stock price, the Compensation Committee believes that
 options motivate executive officers to manage the Company in a
 manner that is consistent with stockholder interests. Stock
 option grants are intended to focus the attention of the recipient
 on the Company's long term performance, which the Company believes
 results in improved stockholder value, and to retain the service
 of the executive officers in a competitive job market by providing
 significant long-term earnings potential." . . . The Committee
 noted finally that "the decision to grant an award is primarily
 based upon a subjective evaluation of the past as well as future
 anticipated performance."

 Based on this evidence, husband argues that the main purpose of the stock
 options is to reward future performance and to keep him working for the
 company in the future. To the extent the unvested options are rewards for
 future performance to occur after the dissolution of the marriage, he
 argues that they cannot be considered marital property.

 ¶ 15. Husband's second source for his position is our treatment of
 employment-related pensions. Our leading case is McDermott v. McDermott,
 150 Vt. 258, 552 A.2d 786 (1988), in which we discussed how to value and
 distribute a pension held by one of the spouses if it has vested but not
 matured. We held that a pension is marital property. Id. at 259, 552 A.2d
 at 788. We held, however, that the court could distribute only that part
 of the pension that was earned during the marriage, and provided the basis
 for making that calculation as follows:
 
 [T]he court must determine what portion of the entitlement was
 acquired during the marriage, and this is accomplished by
 factoring in the so-called "coverture fraction." . . . The
 numerator of the fraction is the number of months or years that
 the employee participated in the plan during the marriage, and the
 denominator is the total number of months or years that the
 employee will have participated in the plan at retirement. Where
 the immediate offset method is used, the present value of the
 benefits is calculated, and this figure is then multiplied by the
 coverture fraction. The result represents the present value of
 the benefits attributable to the marriage, and the court
 distributes the marital property on that basis.

 Id. at 261, 552 A.2d at 789. We reversed the trial court's decision in
 McDermott because the court valued the pension based on its full value at
 the time of the employee's retirement "without acknowledging that a portion
 of the calculated value reflect[ed] plaintiff's future earnings." Id. We
 have reiterated the holding of McDermott in Hayden, 2003 VT 97, ¶ 11, and
 Russell, 157 Vt. at 305, 597 A.2d at 804. ¶ 16. Terming the
 apportionment formula in McDermott a "time rule," husband argues that the
 pension cases are applicable to stock options and whenever present value of
 an asset is based on future work, as well as current and past work, we are
 required to use a "time rule" to apportion the value to ensure that
 compensation for future work is not considered marital property. Thus, he
 argues that, because the family court failed to apportion the unvested
 options according to a time rule, we must reverse and remand for a proper
 apportionment.

 ¶ 17. There is some merit to husband's argument, but it faces two
 significant difficulties. Husband has relied on the family court's summary
 of the evidence, as well as the testimonial and documentary evidence. The
 court's summary is not, however, the equivalent of findings. See Embree v.
 Balfanz, 174 Vt. 560, 562, 817 A.2d 6, 9 (2002) ("A recitation of the
 evidence . . . is not a finding of the facts.") (quoting Krupp v. Krupp,
 126 Vt. 511, 514, 236 A.2d 653, 655 (1967)). The only findings on this
 issue are embedded in the conclusions as follows:
 
 All of the stock options granted to the defendant through the date
 of the final hearing are marital property, as all are awarded
 during the marriage, and were attributable to his work during the
 marriage. The fact that part of the employer's motivation in
 awarding these options was to spur the defendant to greater
 productivity or better performance in the future is not relevant
 to the question of whether these options were property acquired
 during the marriage.

 Thus, the court's findings, while sparse, are directly contrary to
 husband's position. If the findings are not clearly erroneous in light of
 the evidence actually presented, we must uphold them. (FN1) Mizzi v.
 Mizzi, 2005 VT 120, ¶ 7, ___ Vt. ___, 889 A.2d 753 (mem.). We consider
 whether the findings are clearly erroneous below. 

 ¶ 18. The second problem is more complicated and involves the
 difference between apportionment of pension benefits and stock options. As
 husband argues, courts from around the country have used principles
 applicable to apportioning pensions in allocating stock options between
 marital and separate property. At the level of general principles, we
 agree with these decisions. There are, however, differences in the nature
 of pensions and stock options that make allocation of stock options more
 complicated.

 ¶ 19. Pensions are a form of deferred compensation typically based
 on regular contributions made by the employer and employee. Because
 regular contributions are made over time, it is relatively easy to
 apportion between contributions made during the marriage and those made
 after the marriage has ended so that contributions made following the end
 of the marriage are not considered marital property and are not included in
 the value of the pension available for distribution. Thus, in the pension
 context, McDermott endorses the use of a "time rule" to apportion based on
 the time of the contribution.
 
 ¶ 20. The purpose of the pension is clear-to provide income after
 retirement. The purpose of awarding stock options is less clear, in part
 because multiple motives are invariably involved. See Hug, 201 Cal. Rptr.
 at 680. If we used a time rule exclusively to apportion stock options, we
 would be holding that all options that become vested after the cut-off
 time-here the date of the final divorce hearing-are awarded as compensation
 for future work. While it is conceivable that the facts might support such
 a conclusion in an individual case, such a case would be rare. Much more
 common are circumstances in which some part of the options represent
 deferred compensation for past or present performance, even though vesting
 occurs in the future after the expiration of the temporal cut-off date. 
 Options that are deferred compensation for past and present performance
 must be considered marital property even though vesting occurs in the
 future. 

 ¶ 21. Two additional points are important to the allocation issue. 
 First, the purpose of awarding stock options cannot be determined by
 generalizations about the purpose of compensation. As the family court
 noted, all compensation is given in part to keep employees productive and
 thus to induce future desirable performance. It cannot be said that,
 because the purpose of compensation is to ensure future productivity, such
 compensation is given for future work.

 ¶ 22. Second, we have assumed for purposes of discussing husband's
 position that only the purpose of the options and the time period for
 vesting are relevant to allocate the options between marital and
 nonmartial property. In some cases, there is another factor, as described
 by the Supreme Judicial Court of Massachusetts in Baccanti:

 In addition, there may be circumstances, such as a long-term
 marriage in which both parties have contributed to the
 "partnership" and the options are exercisable soon after the
 divorce, where the judge finds that stock options should be deemed
 wholly marital property even though the options were given for
 services to be performed in part after dissolution of the
 marriage. In these cases, the judge must determine the extent of
 each spouses' contribution to the asset. . . . The trial judge
 has discretion . . . to decide whether an asset should be included
 in the marital estate based on the parties' joint efforts in
 acquiring that asset and should not necessarily be confined by the
 period of the marriage. However, the fact that only one party may
 exert efforts after dissolution of the marriage to obtain the
 asset should be taken into account when dividing property in a
 divorce proceeding. 

 752 N.E.2d at 728-29 (internal citations omitted). The court provided
 examples in a footnote, and specifically described a situation in which
 "the value of the employee to the employer, which caused the employer to
 reward the employee with stock options, may have come about as a result of
 the marital partnership" and "[t]he nonemployee spouse may have contributed
 to the employee spouse's ability to achieve the position for which the
 options were given." Id. at 729 n.6; accord Pascale, 660 A.2d at 498-99.
 (FN2) We mention this additional factor here because of its potential
 applicability to this case as discussed infra.
 
 ¶ 23. We return to husband's position and our reasons for rejecting
 it. Putting together the evidence and the pension cases, husband argues
 that the family court should have allocated the unvested stock options
 exclusively by use of a time formula derived from the pension cases. 
 Although there are variations in the details of such formulae, the typical
 formula would, for each block of options, contain a numerator of the time
 period between the date of the award of the options and the final hearing,
 (FN3) and a denominator of the time period between the date of the award
 of the options and the date of vesting. See Davidson, 578 N.W.2d at 857.
 (FN4) The resulting percentage would be multiplied by the value of each
 block of options to produce the value that is marital property. As our
 analysis above makes clear, we cannot endorse husband's argument that
 application of a time rule alone would produce a correct allocation. At
 best, the evidence supports a conclusion that some part of husband's
 unvested options are for past and present work and some are for future
 work. The part for present and past work is marital property in its
 entirety irrespective of when it becomes vested. The only stock options
 that should be apportioned between marital and separate property are those
 awarded as compensation for future services, and only if the nonemployee
 spouse's contribution to acquiring those options is not a factor. For
 those options, a "time rule" is used frequently, but not always, as an
 appropriate method of apportionment. 

 ¶ 24. Thus, with stock options, there are actually two levels of
 apportionment. See Miller, 915 P.2d at 1319 (setting forth two-step
 allocation analysis); Bornemann, 752 A.2d at 989 (outlining allocation
 steps); Valence, 798 A.2d at 39 (directing that time rule applies only to
 options found to be an incentive for future services); DeJesus, 687 N.E.2d
 at 1323 (summarizing and adopting distinct allocation steps); Short, 890
 P.2d at 16-17 (applying two-tired allocation analysis). The first is based
 on the purpose of the stock option grant and seeks to separate out options
 granted for future performance from those granted for present and past
 performance. At this level, the court may also look at the contribution
 made by the non-employee spouse to the acquisition of stock options in the
 future. See Baccanti, 752 N.E.2d at 729 n.7. The second level apportions
 only those options granted for future performance, and not attributable to
 the non-employee spouse, to determine how much of that future performance
 occurred within the marriage.

 ¶ 25. We recognize that the first level of apportionment does not
 lend itself to a mathematical formula, and the family court should consider
 all relevant factors. In this process, neither the language of the stock
 option agreement nor the employer's testimony is dispositive. Davidson,
 578 N.W.2d at 856. Among the relevant factors are:
 
 whether the employee stock options . . . were intended to (1)
 secure optimal tax treatment, (2) induce the employee to accept
 employment, (3) induce the employee to remain with the employer,
 (4) induce the employee to leave his or employment, (5) reward the
 employee for completing a specific project or attaining a
 particular goal, and (6) be granted on a regular or irregular
 basis.

 Id.
 ¶ 26. This case turns primarily on the first apportionment level
 because the family court held that none of the options were awarded for
 future services and considered all the awarded options as marital property. 
 Thus, the court never reached the second level where it might have applied
 a time rule.

 ¶ 27. Although the findings are sparse, we conclude that they are
 not clearly erroneous and the conclusion that the unvested stock options
 are marital property is supported by the findings. By the time of the
 trial, all pre-separation stock options had been exercised or were
 underwater such that exercise of the options did not make economic sense. 
 In fact, although employer had awarded options to husband twice in 2000,
 three times in 2001, and once in 2002 prior to the separation, none had
 been exercised because they had no value in light of the stock price. In
 July 2002, employer awarded options on 424,000 shares at very low option
 prices, and most of these remain unvested. This amount of shares was
 almost as many as employer had awarded to husband in all the years of his
 employment. Although employer awarded options to husband in November 2002,
 April 2002, and February 2004, the numbers of shares-61,000 in the
 aggregate-and the option prices are far less favorable. Thus, the July
 2002 options account for virtually all of the unvested stock option value
 in dispute in this appeal.

 ¶ 28. The family court did make findings about the situation in
 2002:
 
 The defendant received a substantial award of stock options during
 June 2002. At that time, BEA Systems and many other companies
 were recovering from a significant downturn in the technology
 stock market (a.k.a. "the dot com bust"), and were concerned about
 retaining employees whose stock options were now largely worthless
 (underwater). BEA's stock value had dropped from around $60 per
 share to under $10. They therefore issued new stock options with
 lower prices to the defendant and other key employees, in order to
 encourage them to remain there.

 These findings should be read in light of the court's earlier finding that
 stock options had become a significant and essential component of the
 compensation package for executives. Thus, they were being offered as an
 alternative to fixed salary for upper level employees. See DeJesus, 687
 N.E.2d at 1324 (one factor for apportionment is whether stock options are
 offered as an alternative to fixed salaries). For two years, the highest
 level employees in the company took a very large cut in compensation. When
 the economic situation of the company improved, the company restored the
 full compensation package. Based on these circumstances, the family court
 could reasonably find that the July 2002 options were really a make-up
 award for the employees maneuvering the company through the dot com bust to
 a profitable future. 

 ¶ 29. The court could also consider wife's contribution in
 determining what was marital property as we discussed above. We think the
 court could consider this factor because of wife's post-divorce commitment
 to take care of the parties' disabled daughter even after the daughter
 reached the age of majority. The family court found that the daughter
 would always require significant adult supervision and would never be able
 to live on her own. As the family court found, wife's assumption of the
 role of caretaker for the disabled daughter is a "benefit to the defendant,
 and has enabled him to pursue his career without concern about Molly's
 welfare, and with very little direct involvement in her care." Central to
 the stock option issue is the fact that wife continued to assume that
 caretaking role after the divorce, and thus continued to contribute to
 husband's ability to put long hours into his career without having to
 participate in the care of the adult daughter.
 
 ¶ 30. Although factually somewhat different, we find comparable the
 decision of the Connecticut Supreme Court in Bornemann, 752 A.2d 978. In
 that case, husband received stock options as part of his hiring package,
 and they vested over a five year period. Id. at 982. However, husband was
 fired before the last two-fifths of the options vested in the fourth and
 fifth year. Id. The termination agreement allowed husband to still
 exercise the fourth and fifth year options as an employee as long as he
 abided by the terms of the termination agreement-for example, that he not
 obtain other employment that conflicted with the interests of the employer. 
 Id. at 983. Meanwhile, husband and wife separated, and wife asserted that
 the unvested fourth and fifth year options were marital property. The
 superior court agreed, and the Supreme Court affirmed against husband's
 contention that the options were awarded for future performance of the
 termination agreement. Id. at 986-87. 

 ¶ 31. The court found that stock options "are analogous to pension
 benefits in that they bestow a right upon the holder to receive a benefit
 under prescribed conditions." Id. at 985. It went on to hold that "[i]n
 determining when unvested stock options were earned, or will be earned, the
 purpose for which the options were granted must be considered." Id. at
 987. Finally, it upheld the superior court finding as not clearly
 erroneous, concluding that the purpose of the stock option grant was to
 reward husband for past services "and that it was in exchange for those
 services that the defendant was paid his salary through December 1996, and
 was offered the opportunity to retain the options." Id. at 991. In
 response to husband's argument that the court should have, at the least,
 used a time rule to apportion the options, the Supreme Court responded that
 because "we have already determined that the options are marital property
 in their entirety, there is no need to employ a time rule in this case." 
 Id. at 991 n.11. 
 
 ¶ 32. Because the family court's finding is not clearly erroneous,
 and the factor of wife's continuing contribution to husband's ability to
 remain productive and earn options supports the decision as to what is
 marital property, we affirm the family court's decision that all the
 unvested stock options are marital property. Although the court could have
 found, based on the evidence, that part of the purpose of the award of
 options was as compensation for future performance, we act under a limited
 standard of review that allows us to reverse only if findings are clearly
 erroneous based on the evidence. Mizzi, 2005 VT 120, ¶ 5. In reaching
 this conclusion, we stress that we are responding only to the issues raised
 by husband both below and on appeal. Husband has not challenged the
 sparseness of the court's findings and, although he sought use of a time
 rule, he failed to recognize that application of a time rule was only a
 secondary step to allocation based on the purpose of the stock option
 awards and the contribution of wife. Although he had the burden of proof,
 Baccanti, 752 N.E.2d at 730, he made no argument to the court as to how it
 could determine the purposes of the options and how it should allocate
 based on service. See id. at 731-32 (husband waived appeal issue where he
 argued only that unvested options were separate property and did not
 address allocation issue). 

 ¶ 33. Looking at the family court's decision overall, we find it
 more than fair to husband. While stock options are an essential component
 of husband's compensation, the family court considered his future income as
 if he would not be awarded stock options in the future as he had in the
 past. As a result, the stock options in dispute represent only a
 relatively small part of husband's future compensation, and the bulk of
 that compensation will not be considered either in the property
 distribution or in the maintenance award. See n.5 infra. To the extent
 there is unfairness in the overall result, it has disadvantaged wife and
 not husband. 

 C.

 ¶ 34. Next, husband claims the family court erred when it valued the
 unvested stock options for purposes of distribution because the unvested
 stock options are subject to forfeiture should he stop working for the
 company. He argues that the court can distribute the options only in kind
 without assigning a value to them.

 ¶ 35. At trial, both sides presented experts as to the valuation of
 the stock options, and both experts presented testimony on whether a value
 could be assigned with reasonable certainty. Based on the testimony, the
 family court concluded that all of the stock options could be valued, and
 further concluded that the parties actually "came close to an agreement on
 [the stock option] value," differing only by about $308,000. It adopted a
 valuation roughly in the middle of the values proffered by the expert
 witnesses, setting the value of all the options, vested and unvested, at
 $2,646,000. Based on that valuation, it split the transferable stock
 options, giving each party fifty percent. It left the incentive stock
 options, which cannot be transferred, with husband. In value terms, wife
 received options, both vested and unvested, worth $1,226,421, and husband
 received options, vested and unvested, worth $1,419,579. The value of the
 additional options awarded to husband was offset by additional property
 awarded to wife to reach a nearly exact fifty-fifty division of the marital
 assets. The court noted, however, that the valuation of the
 non-transferable options was probably low because they receive more
 favorable capital gains tax treatment. Finally, the family court
 specifically declined to set up a trust, as the court did in Callahan, 361
 A.2d at 563, to distribute the stock options because "such a vehicle would
 require these parties to continue to have contact and would also likely
 require the court to continue . . . supervision or involvement in these
 parties' affairs. This is not in anyone's interests."
 
 ¶ 36. We reject husband's contention that the family court erred in
 its valuation of the unvested stock options. The family court's basis for
 this valuation is well reasoned and based on adequate findings supported by
 evidence in the record. See Kanaan v. Kanaan, 163 Vt. 402, 405, 659 A.2d
 128, 131 (1995) ("[W]e will uphold the court's valuation conclusions as
 long as they are supported by adequate findings, which are in turn
 supported by sufficient evidence in the record."); Chilkott v. Chilkott,
 158 Vt. 193, 197, 607 A.2d 883, 885 (1992) (use of expert testimony to
 value a pension fund is the proper method). In fact, we have previously
 affirmed valuing property despite the existence of contingencies that, if
 not realized, would mean the property value could change in the future. 
 See Chilkott, 158 Vt. at 197, 607 A.2d at 885 (trust interest); McDermott,
 150 Vt. at 260, 552 A.2d at 788 (pension fund). Specifically, we have
 approved the valuation of pensions where the spouse, like husband here,
 must continue to work to be able to exercise the asset. See, e.g.,
 McDermott, 150 Vt. at 260, 552 A.2d at 788. As we noted in Chilkott, even
 though the asset's value may be "contingent on the worker reaching
 retirement, . . . [o]nce we accept the pension contingency, the
 contingencies in the instant case do not defeat the applicability of §
 751(a)." Chilkott, 158 Vt. at 197, 607 A.2d at 885. 

 ¶ 37. We also note in this case that the consequence of an incorrect
 valuation is relatively small. Except for the eight percent of the options
 awarded solely to husband because they were nontransferable, all other
 options were split equally between the parties so that the impact of a
 misvaluation was shared equally. See McDermott, 150 Vt. at 261, 552 A.2d
 at 789 (affirming trial court's method of property distribution where it
 "ensures that the parties share the risk of forfeiture through unemployment
 or death"). 

 ¶ 38. Finally, we note that other courts have addressed the issue of
 valuation and authorized valuation of unvested options despite the
 contingencies involved. See, e.g., Otley, 810 A.2d at 10-11. In Davidson,
 the court specifically endorsed the Black/Sholes method of valuing unvested
 options, the method used by wife's expert witness in this case. 578 N.W.2d
 at 858.
 
 ¶ 39. The family court specifically determined that the stock
 options could be valued, and that another method of distribution would be
 unworkable for the parties and the court. See McDermott, 150 Vt. at
 260-61, 552 A.2d at 788 (affirming distribution method that promotes
 immediacy and finality). The court's decision to divide the property in
 order to reach an equitable distribution was well within its broad
 discretion to distribute property. See Cabot v. Cabot, 166 Vt. 485, 497,
 697 A.2d 644, 652 (1997) (upholding family court's distribution and noting
 irrelevance of possible inaccuracy of net estate value where both parties
 would bear burden of inaccuracy and overall distribution would still be
 just); McDermott, 150 Vt. at 261, 552 A.2d at 789. We affirm its decision. 

 II. Date of Valuations

 ¶ 40. Husband's next argument is that the court erred by valuing the
 parties' assets as of the beginning of the final hearing and ignoring
 evidence that those valuations had become inaccurate by the end of the
 final hearing. Specifically, husband argues that the court (1) ignored the
 fact that BEA Systems stock was dropping in value as the trial went on, and
 the drop affected the valuation of the stock options, and (2) ignored the
 distributions of money from a Merrill Lynch account that the court valued
 and distributed. In making these arguments, husband relies on the
 principle that the court should not "premise its division of marital
 property on outdated valuations of the assets involved" and that equitable
 division "cannot be achieved by reliance on stale valuation data." 
 Cleverly v. Cleverly, 151 Vt. 351, 355, 561 A.2d 99, 101 (1989).

 ¶ 41. Husband made these arguments in his motion to reconsider, and
 the court responded as follows:

 The defendant essentially argues that the court erred in making
 its findings as to the value of the marital assets based upon
 evidence presented at trial because those values fluctuated, as
 the experts for both sides conceded, from week to week during
 trial. However, the court has no realistic choice but to makes
 such findings, using its best judgment. The court does not agree
 that its figures were "stale." The court made its decisions based
 on its best judgment and based upon the evidence presented by both
 parties. The court is satisfied that, in the long term, the
 valuation used by the court will, when all aspects of the property
 division and valuation are taken into account, result in a just
 and equitable division between the parties.

 The merits hearing in this case took eight trial days, spread over three
 months. In this context, constant updating of the value of assets is
 practically impossible. We agree that the court acted well within its
 discretion in its valuation and in denying the motion to modify.
 
 ¶ 42. Our precedents rejecting stale valuations involve time gaps
 between valuation of assets and the distribution of those assets far longer
 than is arguably involved here. Cleverly involves a gap of three years. 
 Id. at 354, 561 A.2d at 101. In Albarelli v. Albarelli, 152 Vt. 46, 48,
 564 A.2d 598, 599 (1989), we added that "marital assets should be valued as
 close to the date of trial as possible." The valuations in this case
 easily met the timeliness standards of our precedents. 

 III. Real Property

 ¶ 43. Husband and his brother Fraser own, as tenants in common,
 three lots of land in Putney, each with a building. One contains the
 marital homestead in which wife lives. Another contains a house in which
 Fraser lives. The third contains a cottage and barn. The evidence
 indicated that Fraser built his house and made substantial improvements to
 it thereafter. Because of that work, husband's evidence indicated that the
 brothers made an oral agreement that Fraser would own outright his house
 and the land on which it stands, and husband would own outright the third
 parcel with the cottage and barn. This oral agreement was not
 memorialized, and the record title reflects the ownership of all the lots
 as tenants in common. 

 ¶ 44. Husband claims that grounds exist to reform the deed in equity
 to represent the oral agreement of the brothers, and that the family court
 erred when it refused to enforce the oral agreement. He further argues
 that Fraser owns the property based on adverse possession or quantum
 meruit. He argues that as a result, the value of his interest in the
 Putney property should be reduced by approximately $94,500. 
 
 ¶ 45. The family court is a court of limited jurisdiction, 4 V.S.A.
 § 454, and that jurisdiction does not include reformation of deeds or
 determination of actions for adverse possession or quantum meruit between
 brothers. We recognize that husband does not actually want the family
 court to reform the deed, but instead to act as if it had been reformed. 
 We find that procedure untenable. According to husband's argument, the
 family court would have to take the house and building occupied by Fraser
 out of the marital property, but husband could thereafter sell his half
 interest in the same property to a bona fide purchaser because the record
 title remains with him. 

 ¶ 46. We are also concerned about burdening divorce proceedings with
 additional ancillary litigation that delays resolution of the divorce
 issues. See Ward v. Ward, 155 Vt. 242, 247, 583 A.2d 577, 581 (1990). 
 This concern is hardly theoretical in a divorce proceeding as complex as
 this one and where wife contests husband's position both factually and
 legally. If husband believes that the record title does not represent the
 true ownership interests, he should have brought an action to reform the
 deeds in superior court. We hold that the family court properly acted
 within its discretion in determining husband's real property interests
 based on the record title. 

 IV. Custody and Maintenance Award

 ¶ 47. The family court has considerable discretion in ruling on
 maintenance, and the party seeking to overturn a maintenance award must
 show there is no reasonable basis to support the award to succeed on
 appeal. Sochin v. Sochin, 2004 VT 85, ¶ 10, 177 Vt. 540, 861 A.2d 1089
 (mem.). Thus, this Court's review is limited to determining whether the
 family court's exercise of discretion was proper and whether a reasonable
 basis supports the award. See Kasser v. Kasser, 2006 VT 2, ¶ 16, 179 Vt.
 259, 895 A.2d 134; Johnson v. Johnson, 155 Vt. 36, 40, 580 A.2d 503, 506
 (1990).
 
 ¶ 48. Husband argues that the court made two errors in determining
 his annual income on which the maintenance and child support award was
 based. Generally, the family court concluded that husband's salary,
 including wages and bonuses but not including stock options, was $430,000
 per year. It also concluded that husband will continue to be awarded stock
 options that would produce an income of roughly $60,000 annually, (FN5)
 creating a total income of $490,000. Husband claims first that the base
 amount is inconsistent with the evidence and the findings, and second, that
 the stock option income is speculative and represents "double dipping" on
 assets distributed as property. We begin with the first claim of error.

 ¶ 49. The court concluded that husband's "base salary as of the
 conclusion of the hearing was $300,000 per year." The court further found
 that since husband's employment with BEA Systems, he has received both
 bonuses and stock options in addition to his base salary, and the base
 salary increased each year of his employment. The court found that husband
 "had the potential to receive additional bonuses each year of 30% of base
 pay, and then from November 2001 to the present, he has had the potential
 to receive bonuses of up to 60% of his base pay." Although the court
 calculated that husband's average annual bonus from January 2000 through
 May 2004 was only $76,492, it also found that "[h]is bonuses have shown a
 trend of significant increases each year." In fact, it found that should
 husband reach his potential of a bonus at the rate of sixty percent of his
 current base pay, "this would amount to $180,000 in additional wages." 
 Considering husband's increasing base salary and the increasing amount of
 bonuses, the court concluded that husband's annual income, excluding that
 from stock options, is $430,000. 

 ¶ 50. The family court's finding of husband's annual salary at
 $430,000 is fully supported by the record. The court was not required to
 use either the average of prior bonus awards or the current base salary to
 determine husband's future income given the history of increases in both
 amounts. We find that the court's income determination, apart from the
 stock option income, was within its discretion. See Kohut v. Kohut, 164
 Vt. 40, 44, 663 A.2d 942, 945 (1995) (court could determine obligor's
 future income in part on his begining a new job that would produce a better
 income).
 
 ¶ 51. We have already discussed the court's determination that
 husband would earn $60,000 annually on the sale of stock options, as well
 as our conclusion that this determination was low. We address here only
 husband's arguments that the court "double dipped" by counting the options
 as both assets and income, and that the court prematurely counted the
 income from future stock option awards.

 ¶ 52. As we said above, the court appeared to derive the $60,000
 additional annual income from future stock option awards. Since the stock
 options had not yet been provided to husband, and were not part of the
 property distribution, his "double dipping" argument does not apply.

 ¶ 53. We add, however, that husband's "double dipping" argument is
 erroneous. In making it, he relies on a case that defined capital gains
 for child support purposes to ensure that obligors in similar circumstances
 were treated equally. See Mabee v. Mabee, 159 Vt. 282, 286, 617 A.2d 162,
 164 (1992) (holding that capital gain resulting from appreciation in value
 of property received in asset distribution could not also be considered
 income for child support obligation). The situation is totally different
 here. Husband was awarded stock options worth over $1,400,000, many of
 which were vested, and it is reasonable to expect that these assets will
 earn income. This income must be considered in determining an appropriate
 maintenance award. See 15 V.S.A. § 752(b)(6). Indeed, the family court
 considered the availability of income from the assets awarded to wife in
 determining her need for maintenance. 
 
 ¶ 54. Husband's other argument is that future awards of stock
 options cannot be considered income because, as the court found, there will
 be at least a year delay in husband's ability to exercise these options. 
 This argument calls for a fine tuning of maintenance awards that is
 unrealistic and would keep the parties in court forever. As the court
 found, stock options were a normal part of husband's compensation package,
 and he received them on a regular basis. At the conclusion of the divorce
 proceeding, he was holding options worth over $1,400,000. It is reasonable
 to assume that he would generate at least $60,000 in income from these
 options in the short term while the stream of income from future awards was
 reestablished. See Hiett v. Hiett, 158 S.W.3d 720, 724 (Ark. Ct. App.
 2004) (stock options anticipated in the future represent income for
 purposes of setting an alimony level). 

 V. Changed Circumstances

 ¶ 55. This case comes to us after the consolidation of two separate
 appeals. The first, considered above, involves the original divorce order. 
 The second, considered here, involves the denial of husband's subsequent
 motion to modify his child support and spousal maintenance obligations
 based on allegedly changed circumstances. Husband made the motion to
 modify on March 5, 2005, only three months after the original divorce
 decree was issued and less than two months after the denial of his motion
 to modify and amend the divorce order. While the grounds were extensive,
 they rely on two central points: (1) husband's income decreased from
 $490,000-the court's finding as to his income-to $353,500, and (2) his
 eldest son, Jonathan, made an "unanticipated permanent move to California"
 greatly increasing his expenses and reducing wife's expenses. He argued
 that either or both of these grounds constitute a real, substantial, and
 unanticipated change of circumstances sufficient to modify the maintenance
 and child support orders.

 ¶ 56. In a brief order issued on April 6, 2005, after a hearing, the
 court denied the motion ruling:

 The allegations in these motions consist almost entirely of
 challenges to the court's findings of fact in the divorce decree. 
 These issues are to be resolved on appeal. The balance of the
 motion consists largely of allegations regarding facts that could
 have been presented at trial (e.g. the reasonably anticipated
 expenses related to Jonathan's relocation), or that are very far
 from being unanticipated or substantial in nature. The defendant
 has failed to meet his burden of alleging a real, substantial, and
 unanticipated change in material circumstances since the issuance
 of the court's final order. 

 Husband's argument on appeal is that the decrease in income and increase in
 expenses constitute unanticipated changes in circumstances as a matter of
 law.
 
 ¶ 57. The family court may modify a child support or spousal
 maintenance order only upon a showing of real, substantial, and
 unanticipated change of circumstances. 15 V.S.A. § 660(a) (child support);
 id. § 758 (spousal maintenance). A change in circumstances is a
 jurisdictional prerequisite to such modifications, Harris v. Harris, 168
 Vt. 13, 17, 714 A.2d 626, 629 (1998), and the burden is on the moving party
 to establish the requisite change, Habecker v. Giard, 2003 VT 18, ¶ 5,
 175 Vt. 489, 820 A.2d 215. "There are no fixed standards for determining
 what meets this threshold," and we must evaluate whether a given change is
 substantial "in the context of the surrounding circumstances." Taylor v.
 Taylor, 175 Vt. 32, 36, 819 A.2d 684, 688 (2002). The ruling is
 discretionary so we will not reverse a decision on whether the threshold
 has been met unless the court's discretion "was erroneously exercised, or
 was exercised upon unfounded considerations or to an extent clearly
 unreasonable in light of the evidence." Id. (citation omitted). 

 ¶ 58. The main grounds for the denial of the motion were that
 husband was trying to relitigate decisions made in the divorce decision and
 that he moved too soon to establish that circumstances had changed with
 respect to his income or expenses. In addition, the court found that the
 expenses for Jonathan were or should have been anticipated by the time of
 the divorce hearing. Indeed, the divorce decision stated that the parties
 had concluded that Jonathan, who was sixteen years old at the time of the
 decision, "would spend this school year (2004-2005) in San Francisco,
 living with the defendant and attending a day school there" and that costs
 of schooling and child care for Jonathan "must be adjusted for the fact
 that [husband] is now paying Jonathan's costs." 
 
 ¶ 59. We recognize that, in circumstances where an obligor achieves
 a substantially lower income than the projection upon which a maintenance
 order is based, the family court can find changed circumstances. See
 Stickney v. Stickney, 170 Vt. 547, 548, 742 A.2d 1228, 1231 (1999) (mem.). 
 This does not mean, however, that the court must find changed circumstances
 if the obligor's income is underperforming the projection three months
 after the maintenance order is issued. This case demonstrates why a family
 court could require the obligor to show underperformance over a substantial
 period of time to justify a downward modification in child support or
 maintenance. Husband's income history showed great volatility from year to
 year, but on average husband earned far more than the income figure on
 which the court set the maintenance and child support awards. The court
 acted well within its discretion to rule that husband's proffer of reduced
 income was more a challenge to the divorce decision than a demonstration of
 changed circumstances and, as a demonstration of changed circumstances, was
 inadequate. Similarly, we affirm the family court's decision that the
 additional expenses for Jonathan were not unanticipated and should have
 been shown at the divorce hearing.

 ¶ 60. Finally, we consider wife's cross-appeal claims. Wife
 cross-appealed from the original divorce decision raising three issues, but
 added in her brief that she would waive consideration of the cross-appeal
 issues if the divorce judgment were affirmed in response to husband's
 claims on appeal. We have rejected husband's claims on appeal and have
 affirmed the divorce decision as well as the rulings on the post-judgment
 motions. Thus, in accordance with wife's contingent waiver, we dismiss her
 cross-appeal. 

 Affirmed.

 FOR THE COURT:



 _______________________________________
 Associate Justice



------------------------------------------------------------------------------
 Footnotes


FN1. Husband has assumed that the court's finding that "all . . . [the
 options] were attributable to his work during the marriage" is a conclusion
 of law and argues that it is inconsistent with the court's findings. By
 the court's findings, husband means the summary of the evidence, which does
 not constitute findings as we noted in the text. We have treated husband's
 argument as if he were arguing that the court's finding on this point is
 clearly erroneous.

FN2. We recognize that this theory might support a conclusion that some part
 of options granted after the dissolution of the marriage are marital
 property. We are not going that far in this case. There is also an issue,
 as discussed infra, whether options awarded in the future are better
 considered either as income or as income-producing property in the
 determination of maintenance and child support.

FN3. Consistent with our analysis above, we have substituted the date of the
 final hearing for the date of separation-the date proposed by husband.

FN4. In some states, the applicable formula must exclude any stock option
 that vested prior to the marriage and any portion of an unvested option
 that reflects compensation for work prior to the marriage. Thus, Davidson
 suggests three formulae depending on the circumstances. 578 N.W.2d at 857. 
 Under 15 V.S.A. § 751(a), marital property includes property brought into
 the marriage by either spouse. See Colm v. Colm, 137 Vt. 487, 490-91, 407
 A.2d 184, 186 (1979).

FN5. Although the family court did not specify how it derived this figure,
 we infer that it represents the interest on the first year of stock options
 awarded to husband under the property distribution. This figure ignores
 the future vesting of stock options pursuant to awards made prior to the
 final hearing and, more important, assumes that husband will never receive
 future stock options, an assumption at variance with the facts found by the
 court. If anything, the family court undervalued the income from husband's
 stock option stream.