920 P.2d 522

**Kimberley GARCIA, f/k/a Kimberley Mayer, Petitioner–Appellee,**

v.

**Michael J. MAYER, Respondent–Appellant.**

Nos. 16663, 16817.

Court of Appeals of New Mexico.

May 7, 1996.

Barbara C. Everage, Kanter & Everage, P.A., Albuquerque, for Appellee.

Richard M. Leverick, Leverick and Musselman, P.C., Albuquerque, for Appellant.

## OPINION

HARTZ, Judge.

1. Michael Mayer (Husband) appeals from two judgments arising from the dissolution of his marriage to Kimberley Garcia (Wife). The dispute on appeal centers on certain stock options granted Husband by his

employer, Qual–Med, Inc. He contends that (1) the parties' Marital Settlement Agreement awarded him the stock options, (2) even if the stock options were not addressed by the Martial Settlement Agreement, they were his separate property, and (3) even if the marital community had an interest in the options, the district court improperly calculated the extent of that interest. In addition, Husband challenges the district court's awards of prejudgment interest and attorney's fees. We affirm.

## THE OPTIONS

2. On January 7, 1992 Husband and Qual–Med entered into a non-qualified stock option agreement. The agreement provided Husband with options to purchase 12,500 shares of Qual–Med stock at a price of $14.875 per share. His right to exercise the options vested in installments. The right to purchase 2500 shares vested one year from the date of the agreement, on January 7, 1993. Options to purchase additional increments of 2500 shares vested on each of the following four anniversary dates. Once the right to exercise an option vested, the right could be exercised during the following three years.

3. On August 27, 1993 the parties were divorced. At that time options to purchase 2500 shares had vested. There is no dispute regarding the interests of the parties in those options, because they were specifically addressed in the Marital Settlement Agreement incorporated into the final decree of divorce.

4. The day after entry of the decree, Qual–Med signed a merger agreement with another corporation. As a result of the merger, the remaining options to purchase 10,000 shares vested as of August 28, 1993. Also, the market price of Qual–Med stock increased dramatically—from $14 a share to as high as $32 a share. Husband exercised the options to purchase 10,000 shares and then sold the shares at a profit. Upon learning that Husband had exercised at least some of the options, Wife petitioned the district court to declare that Husband held half of the options in trust for her and that Husband should pay her accordingly.

## MARITAL SETTLEMENT AGREEMENT

5. Husband contends that the Marital Settlement Agreement unambiguously distributed the unvested stock options to him and that Wife waived her right to any of the options. Wife, on the other hand, contends that the document itself is ambiguous and that the evidence at trial established that the agreement did not address the unvested options.

■ 6. Whether an agreement contains an ambiguity is a question of law. *Mark V, Inc. v. Mellekas,* 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993). We determine that the Marital Settlement Agreement is ambiguous with respect to whether it distributes the unvested options.

7. Several provisions of the agreement are pertinent. The introductory paragraphs contain the following sentence:

[Wife] and [Husband] by their signatures below have stipulated that they have separated and are incompatible, that they have considered all their rights and duties with respect to support, property, debts, and other matters, and that this Agreement is a complete and fair settlement of all rights and obligations arising out of their marriage.

The section disposing of personal intangible property includes the following language:

The personal intangible property of each of the parties is hereby described and set over unto each party as follows:

1. To [Wife], as her sole separate property, the following:

. . . .

e. One half of [Husband's] vested stock options, or 1,250 shares.

2. To [Husband], as his sole separate property, the following:

. . . .

c. One half of [Husband's] vested stock options, or 1,250 shares.

3. [Wife] waives all other claims to [Husband's] pension and retirement investments and PTO [paid time off].

The release paragraph states as follows:

Each party is released and absolved from any obligations to the other except those

obligations arising out of this Agreement, and each releases the other from any liabilities, debts or obligations of any kind incurred by the other and from any claims or demands except those arising out of this Agreement. Each party relinquishes any right, title or interest in or to any earnings, accumulations, future investments, money or property of the other party except as contained herein.

8. Although the agreement purports to settle "all rights and obligations arising out of [the] marriage," it omits any mention of the unvested options. There are at least four possible reasons for the omission: (1) the parties intended the options to remain in Husband's hands; (2) they assumed that the unvested options were Husband's separate property and did not need to be addressed by the agreement, (3) the omission was an oversight, or (4) they were unable to agree on how to dispose of the unvested options and therefore left the matter for future resolution. The introduction and disposition provisions of the agreement do not resolve the intent of the parties on the matter.

9. Husband contends that any ambiguity is removed by the provision that "[e]ach party relinquishes any right, title or interest in or to any earnings, accumulations, future investments, money or property of the other party except as contained herein." That language, however, is itself ambiguous. Husband argues that he retains all rights to the options because the options constituted "earnings" and the provision relinquished any interest Wife may have in his earnings. Yet one could just as well refer to the options as "property." If "property of the other party" means "separate property of the other party"—a reasonable construction of the language—then the release provision has no application to the community's interest in the unvested options. We hold that the language within the Marital Settlement Agreement is insufficient in itself to resolve the ambiguity.

10. Husband's reliance on *Pacheco v. Quintana*, 105 N.M. 139, 730 P.2d 1 (Ct.App. 1985), *cert. quashed*, 105 N.M. 94, 728 P.2d 845 (1986), is misplaced. The marital settlement agreement at issue in *Pacheco* provided that the husband would "retain the balance of the community property as his sole and separate estate," with certain enumerated exceptions. *Id.* at 140, 730 P.2d at 2. That language unambiguously provided for the disposition of any community property not specifically divided by the agreement. *Id.* at 142, 730 P.2d at 4. The language before us on this appeal is not nearly as precise in this regard.

11. Because the Marital Settlement Agreement is ambiguous, its meaning is a question of fact. *Mark V*, 114 N.M. at 781–82, 845 P.2d at 1235–36. In this case the trial judge acted as the finder of fact; if her findings are supported by substantial evidence, we must affirm. *See Baker v. Benedict*, 92 N.M. 283, 287, 587 P.2d 430, 434 (1978). We need not set forth the evidence she relied upon. Suffice it to say that the testimony and documentary evidence regarding the negotiation of the agreement would support a determination by a reasonable person that division of the unvested options was not resolved by the agreement. We therefore affirm the district court's decision to divide the unvested options without reference to the agreement.

## WERE THE UNVESTED OPTIONS SEPARATE PROPERTY?

12. The failure of the Marital Settlement Agreement to apportion the unvested options does not mean that Wife was entitled to an interest in the options. She had an interest in the options only if they were, at least in part, community property. Husband contends that the unvested options were his separate property. We disagree.

13. At the time of the divorce decree Husband had no right to exercise any of the unvested options. Nevertheless, his stock option agreement with Qual–Med conferred a contingent benefit. Part of the labor necessary to earn the ultimate benefit (the vested options) had been performed by Husband during the marriage. The fruit of a spouse's labor before divorce is community property. *See Irwin v. Irwin*, 121 N.M. 266, 269, 910 P.2d 342, 345 (Ct.App.1995); *DeTevis v. Aragon*, 104 N.M. 793, 798, 727 P.2d 558, 563 (Ct.App.1986).

14. We have previously held that a contingent benefit may be marital property even if it has no value at the time of the divorce. *See Berry v. Meadows,* 103 N.M. 761, 767, 713 P.2d 1017, 1023 (Ct.App.1986). In *Berry* the husband had worked for his employer for four years prior to the divorce. The employer provided retirement benefits, but they would not vest until Husband had worked for the employer for ten years. We stated: "When a substantial portion of the time and labor of a spouse has been expended during marriage to obtain retirement benefits but the right in retirement benefits has not yet vested, the worker has still accrued a valuable right in a contingent benefit." *Id.* at 766, 713 P.2d at 1022.

15. Likewise, although Husband would not have a vested right in the options unless he continued to work for Qual–Med after dissolution of the marriage, his contract with Qual–Med provided "a valuable right in a contingent benefit." We therefore hold that the community had an interest in the unvested options to the extent that the ultimate vested rights were earned by Husband's labor during marriage.

16. We recognize that some other jurisdictions have held that stock options not vested at the time of divorce cannot be marital property. *See Hann v. Hann,* 655 N.E.2d 566 (Ind.Ct.App.1995); *Hall v. Hall,* 88 N.C.App. 297, 363 S.E.2d 189. But the majority of jurisdictions to consider the issue have decided otherwise. *See In re Marriage of Hug,* 154 Cal.App.3d 780, 201 Cal.Rptr. 676 (1984); *Goodwyne v. Goodwyne,* 639 So.2d 1210 (La.Ct.App.), *writ denied,* 645 So.2d 211 (La.1994); *Green v. Green,* 64 Md. App. 122, 494 A.2d 721 (1985); *Salstrom v. Salstrom,* 404 N.W.2d 848 (Minn.Ct.App. 1987); *Smith v. Smith,* 682 S.W.2d 834 (Mo. Ct.App.1984); *Callahan v. Callahan,* 142 N.J.Super. 325, 361 A.2d 561 (Ch.Div.1976); *In re Marriage of Short,* 125 Wash.2d 865, 890 P.2d 12, 16–17 (1995) (en banc); *Chen v. Chen,* 142 Wis.2d 7, 416 N.W.2d 661 (1987), *review denied,* 142 Wis.2d 953, 419 N.W.2d 562 (1988); *see also* Principles of the Law of Family Dissolution: Analysis and Recommendations § 4.08(1)(b) (Tentative Draft No. 2, 1996) [hereinafter Tentative Draft No. 2].

Moreover, the decisions from jurisdictions that recognize community property—*Hug, Goodwyne, Short,* and *Chen*—are entitled to more weight, because considerations that are irrelevant under a community-property regime may be persuasive under a different system for determining marital-property disputes. In short, even were we to turn to out-of-state authority, we would not be inclined to retreat from the course we took in *Berry* with respect to unvested employee benefits.

**COMMUNITY–PROPERTY SHARE OF OPTIONS**

17. The options that were not vested on the date of marital dissolution would not vest unless Husband continued his employment with Qual–Med. Thus, the ultimate right to exercise one of the options was the result of a combination of Husband's labor after dissolution and Husband's labor before dissolution.

18. Ordinarily, the amount of post-dissolution labor necessary to acquire a vested option is readily computed: it is labor from the time of dissolution of the marriage to the time the options vest. There may be greater difficulty, however, in deciding what pre-dissolution labor was necessary to obtain the options. Certainly, it was necessary for Husband to stay employed with Qual–Med from the date of the stock option agreement (January 7, 1992) to the date of dissolution. If Husband had left his employment with Qual–Med, he would have lost his right to any options that had not already vested.

19. The more difficult question is whether to consider employment prior to the date of the stock option agreement. The answer depends upon whether pre-agreement employment was a factor in Qual–Med's decision regarding whether to grant option rights to Husband or how many option rights to convey. Put another way, the court must determine whether the option rights were, in whole or in part, compensation for effort prior to the date of the stock option agreement or whether the option rights were granted solely as an incentive for future employment and effort.

20. There is no *a priori* reason to treat all options the same. The purpose of

awarding options to employees may differ from company to company and may even change from time to time within a single company. "[N]o single characterization can be given to employee stock options. Whether they can be characterized as compensation for future services, for past services, or for both, depends upon the circumstances involved in the grant of the employee stock option." *Hug,* 201 Cal.Rptr. at 681. Consequently, "[N]o single rule or formula is applicable to every dissolution case involving employee stock options. Trial courts should be vested with broad discretion to fashion approaches which will achieve the most equitable results under the facts of each case." *Id.* at 685. In *Hug* the trial court had found that the options had been granted in lieu of bonus pay. The trial court therefore computed the coverture factor—the marital community's share of the options—as a fraction whose numerator equaled the husband's months of employment with the employer prior to the parties' separation[1] and whose denominator equaled the number of months that the husband was employed prior to the date that the options vested. The California Court of Appeal affirmed the decision as being within the trial court's discretion. When, however, a trial court has found that the options were granted solely to encourage future employment and efforts, the California Court of Appeal has upheld a decision calculating the coverture factor as a fraction whose numerator is the number of months from the date of the grant of the options to the date of separation and whose denominator is the number of months from the date of the grant to the date of vesting. *See In re Marriage of Harrison,* 179 Cal.App.3d 1216, 225 Cal.Rptr. 234 (Ct.App.), *review denied* (July 9, 1986).

21. As conceded by Husband at oral argument on appeal, the parties at trial did not focus on how to calculate the community's share of the options. Rather, the parties assumed that the result would be all or nothing; that is, either the options were Husband's sole separate property, or the options

were totally community property, in which case Wife would have a one-half interest in the options. The district court ruled, however, that the interests in the options be divided in accordance with the formula approved by *Hug.* For example, with respect to the options that were to become vested in January 1994, the court found that the coverture factor was 60/64. The numerator of 60 was the district court's calculation of the number of months that Husband had been employed by Qual–Med as of the date of the marital dissolution. The denominator of 64 was the district court's computation of the number of months from the date of Husband's employment to the date of vesting of those options. Similarly, the coverture factor for the options that were due to vest in January 1995 was 60/76.

22. On appeal Husband contends that the options were intended as "golden handcuffs" to induce future employment and efforts and that his employment prior to the stock option agreement was irrelevant. Therefore, he argues, the calculation of the coverture factor should not take into account his pre-agreement employment. For example, the community share of the options that vested in January 1994 would be 20/24 because there were 20 months from the date of the agreement to the date of marital dissolution and there were 24 months from the date of the agreement to the date that the options vested. The appropriate fraction for options vesting in January 1995 would be 20/36.

23. We agree with Husband that the limited evidence on the matter at trial would appear to support only a finding that the options were granted to induce future employment and effort. Nevertheless, the district court's division of the options was within the court's broad discretion. *See Smith v. Smith,* 114 N.M. 276, 280, 837 P.2d 869, 873 (Ct.App.1992); *Hug,* 201 Cal.Rptr. at 685.

24. This conclusion follows from a striking feature of this case: The options vested prematurely. Indeed, they vested the day after dissolution of the marriage. (The dis-

---

1. Under California law the earnings of spouses are separate property once the spouses separate. *See Hug,* 201 Cal.Rptr. at 679 n. 1. Under New Mexico law earnings are community property until the time of divorce. *See Irwin,* 121 N.M. at 269, 910 P.2d at 345; *DeTevis,* 104 N.M. at 798, 727 P.2d at 563; NMSA 1978, § 40–3–8 (Repl. Pamp.1994).

trict court found that neither Husband nor Wife had any reason to anticipate that this would happen.) Because the unvested options were not divided between Husband and Wife at the time of marital dissolution, it would not be inappropriate for the district court to take into account the actual date at which the options vested, rather than relying solely on the expected dates of vesting set forth in the stock option agreement. After all, the ultimate value of an unvested option will depend on whether the option ever vests (that is, whether the employee spouse continues working for the employer sufficiently long) and the price of the stock once the option vests. Given that such contingencies must already be considered in dividing the options between the former spouses, it is reasonable also to take into account contingencies regarding the date of vesting. *See* Tentative Draft No. 2, *supra*, § 4.08(3)(b) (recognizing advisability in certain circumstances of court's reserving jurisdiction to divide property after dissolution). Had the court computed the coverture factor on the basis of the date that the options actually vested, the community would be entitled to virtually 100% of the options. Husband cannot complain that the district court used a coverture factor more favorable to him than it might have. Hence, we affirm the district court's calculation of the coverture factor.

## PREJUDGMENT INTEREST AND ATTORNEY'S FEES

25. Husband also challenges the district court's awards of prejudgment interest and attorney's fees. We will set aside such awards only if the district court abuses its discretion. *See* NMSA 1978, § 56–8–4(B) (Cum.Supp.1995) (prejudgment interest); *Lebeck v. Lebeck*, 118 N.M. 367, 375, 881 P.2d 727, 735 (Ct.App.1994) (attorney's fees). After reviewing the record we find no abuse of discretion.

## CONCLUSION

26. We affirm the judgment of the district court. We award Wife $2000 for attorney's fees on appeal.

27. **IT IS SO ORDERED.**

DONNELLY and ALARID, JJ., concur.