924 A.2d 19 (2007)
2007 VT 15
Jo-Ellen GOLDEN (Cooper-Ellis)
v.
Peter COOPER-ELLIS.
No. 05-065, 05-169.
Supreme Court of Vermont.
March 2, 2007.
*22 Katherine A. Hayes, J.
Jeremy Dworkin, South Londonderry, for Plaintiff-Appellee and Cross-Appellant.
Bettina V. Buehler of McCarty, Buehler & Bixby, P.C., Brattleboro, and Jill Hersh of Hersh Family Law Practice, San Francisco, California, for Defendant-Appellant and Cross-Appellee.
Present: REIBER, C.J., DOOLEY, JOHNSON, SKOGLUND and BURGESS, JJ.
*23 DOOLEY, J.
¶ 1. Husband Peter Cooper-Ellis appeals from both the final divorce order dividing the parties' marital estate and orders denying his subsequent motion to modify spousal maintenance and child support. Husband makes numerous contentions of error. Most significantly, he claims that the family court erred when it included all of his unvested stock options in the marital estate. Husband also claims that the court erred in its (1) determination of the present value of his unvested stock options at the date of trial, (2) division of the assets of the marital estate based on outdated valuations, (3) finding that he had an interest attributable to the marital estate in a residence he co-owned with his brother, (4) setting his maintenance and support obligations on annual income levels contrary to previous findings, and (5) denial of his motion to modify the spousal maintenance and child support awards. We affirm.
¶ 2. The parties were married on July 31, 1986, and have three children, Molly, Jonathan, and Andrew, born in the marriage. Husband also has an adult daughter from a prior marriage, and a baby daughter born to his current partner with whom he resides in California. Although the determination of the actual date of separation is complicated by the fact that husband has been employed in California since 1999 while wife has continued to reside in Vermont, the family court found that the parties permanently separated, with no attempt to resume married life, in April 2002.
¶ 3. At the time the parties met and began their marriage, both were employed and earning similar salaries. When the children were born, wife originally continued working full-time and then worked part-time until the spring of 1995 when she remained at home as their primary care-giver. The parties' oldest child, Molly, suffers from Smith-Meginis Syndrome, which is untreatable. Molly is also diagnosed as mildly retarded, and she has difficulty regulating her temper and is physically aggressive. The parties have agreed that wife will continue to be Molly's primary caregiver; Molly, now eighteen years old, has a normal life-expectancy. Jonathan, now seventeen years old, moved to California and resides there with husband. Andrew is thirteen years old and continues to reside with wife in Vermont.
¶ 4. Husband lives in California and is currently employed by BEA Systems as executive vice-president of engineering. The family court found husband's total annual income excluding stock options to be $430,000. Central to this dispute, however, the family court found that a significant part of husband's income is provided to him through stock options in his employer's company, and the court made findings of the income husband receives from the exercise of those options and the value of those options. The court's apportionment of the option shares constitutes the most litigated aspect of the divorce.
¶ 5. Husband's employer provided him with groups of stock options on twenty-three occasions from September 16, 1997 to the end of trial. The options are a central, if irregular, part of husband's compensation package. The options cannot be exercised immediately. Under the 1997 stock option plan adopted by the company, which generally applied after that date, twenty-five percent of the amount could be exercised at the one year anniversary of the date of the grant. At each monthly interval thereafter 1/48th of the amount could be exercised until all are accounted for at the four year anniversary. All options must be exercised within ten years of the date they are granted. For purposes *24 of analysis, we refer to options that can be exercised as "vested."
¶ 6. Husband can exercise the options only if he is an employee of BEA Systems on the date of exercise. The options consist of both nonqualified options, which are transferable, and incentive options, which are nontransferable and taxed at a much lower rate than nonqualified options. Option exercise prices range from $3.45 per share to $62.13 per share. At the time of the divorce hearing, some vested options were underwater  that is, the price at which husband could purchase the stock was higher than the market value price  so exercising those options would bring no benefit. The period remaining for exercise of those options not yet exercised ranged at trial from three and one-half years to nearly ten years.
¶ 7. As of March 29, 2004, husband had been awarded stock options to purchase 953,100 shares of BEA Systems stock and had exercised options as to 267,352 of these shares, leaving options for 685,748 shares unexercised. Options for 308,132 of the remaining shares were vested, although many were underwater, and husband had between three and one-half and ten years to exercise these options depending on when they were granted. The rest  options on approximately 375,000 shares  remained unvested. From 2000 to 2004, husband received nearly $6,000,000 in profit from acquiring the stock pursuant to the options. His average annual income from the exercise of stock options has been $1,191,838.
¶ 8. At the conclusion of the final hearing, the family court issued a lengthy order. Ultimately, the court divided the value of the marital estate assets equally between the parties. It also set forth a child support order and an order for husband to pay wife spousal maintenance. The specifics of the contested issues are outlined below. The most contested is the family court's inclusion of all of husband's stock options, including the options that had not vested at the time of the final hearing, in the marital estate for equitable division.

I. Stock Options
¶ 9. Husband argues that the family court erred in awarding wife one-half of his employee stock options that were unvested at the time the parties separated. He stipulates that some portion of the unvested options may be considered marital property, but argues that the portion that is marital property must be attributable to his work during the marriage and most of the stock options were awarded for work in the future. He argues that the family court should have divided the options according to a "time rule" designed to determine what portion of the options can be included in the marital estate and what part are his separate property. Additionally, he argues that no options awarded after the date of separation should be considered marital property.

A.
¶ 10. We start with husband's second argument and address whether the family court erred by including in the marital estate options acquired between the date of the parties' separation and the date of the final divorce hearing. The governing statute regarding the distribution of marital assets requires that "[a]ll property owned by either or both of the parties, however and whenever acquired, . . . be subject to the jurisdiction of the court." 15 V.S.A. § 751(a) (emphasis added). Assets are normally valued for distribution as of the day of the final divorce hearing, regardless of whether they were acquired during or after the parties separated. Hayden v. Hayden, 2003 VT 97, ¶ 8, 176 *25 Vt. 52, 838 A.2d 59; see also Nuse v. Nuse, 158 Vt. 637, 638, 601 A.2d 985, 986 (1991) (mem.) (upholding court's inclusion of house acquired after separation as marital asset subject to division); Bero v. Bero, 134 Vt. 533, 535, 367 A.2d 165, 167 (1976) (affirming inclusion of tort settlement received after divorce was filed as marital asset). Nothing in the statutory wording suggests that the court's jurisdiction to divide property of the parties extends only to property owned as of the date the parties separated. Thus, the family court acted within its discretion in considering stock options received by husband after the date of separation and including them in the marital estate for division.
¶ 11. Husband's argument on this point is linked to his primary argument that the family court should have included as marital property only part of the unvested stock options, and that the appropriate cut-off date for purposes of an allocation formula is the date of separation. For this argument, as well as his larger argument, husband draws from our pension cases which have sometimes used the date of separation as a temporal dividing line. See, e.g., Russell v. Russell, 157 Vt. 295, 305, 597 A.2d 798, 804 (1991). Russell is based on the determination in that case that the date of separation was the "date . . . most reflective of the functional end of marriage." Id.
¶ 12. In Hayden, we explained that Russell dealt with how to apportion pension funds, and not the definition of marital property, and in any event, set no hard and fast rule. Hayden, 2003 VT 97, ¶¶ 12-13, 176 Vt. 52, 838 A.2d 59. That caution about the use of Russell is particularly applicable here. Apparently because of the overall performance of BEA Systems, the company did not award stock options for an extended period, and many of the options it had awarded were underwater. In part to make up for these shortfalls, it awarded substantial options between the date the family court determined that the parties "separated" and the date of dissolution of the marriage. Using the date of separation as a cut-off date would fail to capture as marital property a significant part of husband's compensation for the marital period. See, e.g., Pascale v. Pascale, 140 N.J. 583, 660 A.2d 485, 498 (1995) (stock options awarded after termination of marriage were properly included as marital property). We conclude that the family court acted within its discretion in determining that the stock options awarded after separation were marital property subject to distribution.

B.
¶ 13. The crux of the issue on appeal is the court's treatment of husband's unvested stock options, whether acquired before or after the parties separated. As we noted above, husband concedes that some part of these options may be considered marital property. We agree. Accord In re Marriage of Hug, 154 Cal.App.3d 780, 201 Cal.Rptr. 676, 685 (1984); In re Marriage of Miller, 915 P.2d 1314, 1319 (Colo. 1996); Bornemann v. Bornemann, 245 Conn. 508, 752 A.2d 978, 985 (1998); Batra v. Batra, 135 Idaho 388, 17 P.3d 889, 894 (Ct.App.2001); Goodwyne v. Goodwyne, 639 So.2d 1210, 1213 (La.Ct.App.1994); Otley v. Otley, 147 Md.App. 540, 810 A.2d 1, 6 (2002); Baccanti v. Morton, 434 Mass. 787, 752 N.E.2d 718, 727 (2001); Salstrom v. Salstrom, 404 N.W.2d 848, 850-51 (Minn.Ct.App.1987); Davidson v. Davidson, 254 Neb. 656, 578 N.W.2d 848, 855 (1998); In re Valence, 147 N.H. 663, 798 A.2d 35, 39 (2002); Callahan v. Callahan, 142 N.J.Super. 325, 361 A.2d 561, 563 (Ch. Div.1976); Garcia v. Mayer, 122 N.M. 57, 920 P.2d 522, 525 (Ct.App.1996); DeJesus v. DeJesus, 90 N.Y.2d 643, 665 N.Y.S.2d *26 36, 687 N.E.2d 1319, 1323 (1997); Fisher v. Fisher, 564 Pa. 586, 769 A.2d 1165, 1169 (2001); Bodin v. Bodin, 955 S.W.2d 380, 381 (Tex.Ct.App.1997); In re Marriage of Short, 125 Wash.2d 865, 890 P.2d 12, 15 (1995) (en banc); Chen v. Chen, 142 Wis.2d 7, 416 N.W.2d 661, 663 (Ct.App.1987), review denied, 142 Wis.2d 953, 419 N.W.2d 562 (1988). But see Hann v. Hann, 655 N.E.2d 566, 569 (Ind.Ct.App.1995); Hall v. Hall, 88 N.C.App. 297, 363 S.E.2d 189, 195-96 (1987); Ettinger v. Ettinger, 637 P.2d 63, 65 (Okla.1981). Unlike the family court, however, husband takes the position that some of the unvested options were given as compensation for future work to occur after the dissolution of the marriage, and these options cannot be considered part of the marital estate. In making this argument, he draws on two sources in particular  the factual record as to the purpose of the stock options, and our treatment of employee pensions as part of marital property  as well as decisions from other states. We first turn to his sources for his argument.
¶ 14. There is no question that as an upper level executive, husband received stock options as part of his basic compensation package, and the family court so found. The court summarized the evidence on the purposes of the stock option plan as follows:
[I]n granting stock options to employees, employers have many goals. They seek to retain employees whose work they value; they seek to align the employees' interests with those of shareholders in the company; they seek to motivate the employee to perform better in the future; and they seek to give the employee the incentive to stay. These purposes are overlapping and inextricably entwined. . . .
Jeanne Wu, a senior vice-president for human resources at BEA, testified that . . . such options are used to reward employees for performance, and to retain them for the future. . . .
The [BEA] . . . compensation committee report confirmed that: "Because of the direct relationship between the value of an option and the stock price, the Compensation Committee believes that options motivate executive officers to manage the Company in a manner that is consistent with stockholder interests. Stock option grants are intended to focus the attention of the recipient on the Company's long term performance, which the Company believes results in improved stockholder value, and to retain the service of the executive officers in a competitive job market by providing significant long-term earnings potential." . . . The Committee noted finally that "the decision to grant an award is primarily based upon a subjective evaluation of the past as well as future anticipated performance."
Based on this evidence, husband argues that the main purpose of the stock options is to reward future performance and to keep him working for the company in the future. To the extent the unvested options are rewards for future performance to occur after the dissolution of the marriage, he argues that they cannot be considered marital property.
¶ 15. Husband's second source for his position is our treatment of employment-related pensions. Our leading case is McDermott v. McDermott, 150 Vt. 258, 552 A.2d 786 (1988), in which we discussed how to value and distribute a pension held by one of the spouses if it has vested but not matured. We held that a pension is marital property. Id. at 259, 552 A.2d at 788. We held, however, that the court could distribute only that part of the pension that was earned during the marriage, and *27 provided the basis for making that calculation as follows:
[T]he court must determine what portion of the entitlement was acquired during the marriage, and this is accomplished by factoring in the so-called "coverture fraction." . . . The numerator of the fraction is the number of months or years that the employee participated in the plan during the marriage, and the denominator is the total number of months or years that the employee will have participated in the plan at retirement. Where the immediate offset method is used, the present value of the benefits is calculated, and this figure is then multiplied by the coverture fraction. The result represents the present value of the benefits attributable to the marriage, and the court distributes the marital property on that basis.
Id. at 261, 552 A.2d at 789. We reversed the trial court's decision in McDermott because the court valued the pension based on its full value at the time of the employee's retirement "without acknowledging that [a]portion of the calculated value reflect[ed] plaintiff's future earnings." Id. We have reiterated the holding of McDermott in Hayden, 2003 VT 97, ¶ 11, 176 Vt. 52, 838 A.2d 59, and Russell, 157 Vt. at 305, 597 A.2d at 804.
¶ 16. Terming the apportionment formula in McDermott a "time rule," husband argues that the pension cases are applicable to stock options and whenever present value of an asset is based on future work, as well as current and past work, we are required to use a "time rule" to apportion the value to ensure that compensation for future work is not considered marital property. Thus, he argues that, because the family court failed to apportion the unvested options according to a time rule, we must reverse and remand for a proper apportionment.
¶ 17. There is some merit to husband's argument, but it faces two significant difficulties. Husband has relied on the family court's summary of the evidence, as well as the testimonial and documentary evidence. The court's summary is not, however, the equivalent of findings. See Embree v. Balfanz, 174 Vt. 560, 562, 817 A.2d 6, 9 (2002) (mem.) (`"A recitation of evidence . . . is not a finding of the facts'. . . .") (quoting Krupp v. Krupp, 126 Vt. 511, 514, 236 A.2d 653, 655 (1967)). The only findings on this issue are embedded in the conclusions as follows:
All of the stock options granted to the defendant through the date of the final hearing are marital property, as all are awarded during the marriage, and were attributable to his work during the marriage. The fact that part of the employer's motivation in awarding these options was to spur the defendant to greater productivity or better performance in the future is not relevant to the question of whether these options were property acquired during the marriage.
Thus, the court's findings, while sparse, are directly contrary to husband's position. If the findings are not clearly erroneous in light of the evidence actually presented, we must uphold them.[1]Mizzi v. Mizzi, 2005 VT 120, ¶ 7, 179 Vt. 555, 889 A.2d 753 *28 (mem.). We consider whether the findings are clearly erroneous below.
¶ 18. The second problem is more complicated and involves the difference between apportionment of pension benefits and stock options. As husband argues, courts from around the country have used principles applicable to apportioning pensions in allocating stock options between marital and separate property. At the level of general principles, we agree with these decisions. There are, however, differences in the nature of pensions and stock options that make allocation of stock options more complicated.
¶ 19. Pensions are a form of deferred compensation typically based on regular contributions made by the employer and employee. Because regular contributions are made over time, it is relatively easy to apportion between contributions made during the marriage and those made after the marriage has ended so that contributions made following the end of the marriage are not considered marital property and are not included in the value of the pension available for distribution. Thus, in the pension context, McDermott endorses the use of a "time rule" to apportion based on the time of the contribution.
¶ 20. The purpose of the pension is clear  to provide income after retirement. The purpose of awarding stock options is less clear, in part because multiple motives are invariably involved. See Hug, 201 Cal.Rptr. at 680. If we used a time rule exclusively to apportion stock options, we would be holding that all options that become vested after the cut-off time  here the date of the final divorce hearing  are awarded as compensation for future work. While it is conceivable that the facts might support such a conclusion in an individual case, such a case would be rare. Much more common are circumstances in which some part of the options represent deferred compensation for past or present performance, even though vesting occurs in the future after the expiration of the temporal cut-off date. Options that are deferred compensation for past and present performance must be considered marital property even though vesting occurs in the future.
¶ 21. Two additional points are important to the allocation issue. First, the purpose of awarding stock options cannot be determined by generalizations about the purpose of compensation. As the family court noted, all compensation is given in part to keep employees productive and thus to induce future desirable performance. It cannot be said that, because the purpose of compensation is to ensure future productivity, such compensation is given for future work.
¶ 22. Second, we have assumed for purposes of discussing husband's position that only the purpose of the options and the time period for vesting are relevant to allocate the options between marital and nonmartial property. In some cases, there is another factor, as described by the Supreme Judicial Court of Massachusetts in Baccanti:
In addition, there may be circumstances, such as a long-term marriage in which both parties have contributed to the "partnership" and the options are exercisable soon after the divorce, where the judge finds that stock options should be deemed wholly marital property even though the options were given for services to be performed in part after dissolution of the marriage. In these cases, the judge must determine the extent of each spouses' contribution to the asset. . . . The trial judge has discretion . . . to decide whether an asset should be included in the marital estate based on the parties' joint efforts in acquiring *29 that asset and should not necessarily be confined by the period of the marriage. However, the fact that only one party may exert efforts after dissolution of the marriage to obtain the asset should be taken into account when dividing property in a divorce proceeding.
752 N.E.2d at 728-29 (internal citations omitted). The court provided examples in a footnote, and specifically described a situation in which "the value of the employee to the employer, which caused the employer to reward the employee with stock options, may have come about as a result of the marital partnership" and "[t]he nonemployee spouse may have contributed to the employee spouse's ability to achieve the position for which the options were given." Id. at 729 n. 6; accord Pascale, 660 A.2d at 498-99.[2] We mention this additional factor here because of its potential applicability to this case as discussed infra.
¶ 23. We return to husband's position and our reasons for rejecting it. Putting together the evidence and the pension cases, husband argues that the family court should have allocated the unvested stock options exclusively by use of a time formula derived from the pension cases. Although there are variations in the details of such formulae, the typical formula would, for each block of options, contain a numerator of the time period between the date of the award of the options and the final hearing,[3] and a denominator of the time period between the date of the award of the options and the date of vesting. See Davidson, 578 N.W.2d at 857.[4] The resulting percentage would be multiplied by the value of each block of options to produce the value that is marital property. As our analysis above makes clear, we cannot endorse husband's argument that application of a time rule alone would produce a correct allocation. At best, the evidence supports a conclusion that some part of husband's unvested options are for past and present work and some are for future work. The part for present and past work is marital property in its entirety irrespective of when it becomes vested. The only stock options that should be apportioned between marital and separate property are those awarded as compensation for future services, and only if the nonemployee spouse's contribution to acquiring those options is not a factor. For those options, a "time rule" is used frequently, but not always, as an appropriate method of apportionment.
¶ 24. Thus, with stock options, there are actually two levels of apportionment. See Miller, 915 P.2d at 1319 (setting forth two-step allocation analysis); Bornemann, 752 A.2d at 989 (outlining allocation steps); Valence, 798 A.2d at 39 (directing that time rule applies only to options found to be an incentive for future *30 services); DeJesus, 665 N.Y.S.2d 36, 687 N.E.2d at 1323 (summarizing and adopting distinct allocation steps); Short, 890 P.2d at 16-17 (applying two-tired allocation analysis). The first is based on the purpose of the stock option grant and seeks to separate out options granted for future performance from those granted for present and past performance. At this level, the court may also look at the contribution made by the nonemployee spouse to the acquisition of stock options in the future. See Baccanti, 752 N.E.2d at 729 n. 7. The second level apportions only those options granted for future performance, and not attributable to the nonemployee spouse, to determine how much of that future performance occurred within the marriage.
¶ 25. We recognize that the first level of apportionment does not lend itself to a mathematical formula, and the family court should consider all relevant factors. In this process, neither the language of the stock option agreement nor the employer's testimony is dispositive. Davidson, 578 N.W.2d at 856. Among the relevant factors are:
whether the employee stock options . . . were intended to (1) secure optimal tax treatment, (2) induce the employee to accept employment, (3) induce the employee to remain with the employer, (4) induce the employee to leave his or her employment, (5) reward the employee for completing a specific project or attaining a particular goal, and (6) be granted on a regular or irregular basis.
Id.
¶ 26. This case turns primarily on the first apportionment level because the family court held that none of the options were awarded for future services and considered all the awarded options as marital property. Thus, the court never reached the second level where it might have applied a time rule.
¶ 27. Although the findings are sparse, we conclude that they are not clearly erroneous and the conclusion that the unvested stock options are marital property is supported by the findings. By the time of the trial, all pre-separation stock options had been exercised or were underwater such that exercise of the options did not make economic sense. In fact, although employer had awarded options to husband twice in 2000, three times in 2001, and once in 2002 prior to the separation, none had been exercised because they had no value in light of the stock price. In July 2002, employer awarded options on 424,000 shares at very low option prices, and most of these remain unvested. This amount of shares was almost as many as employer had awarded to husband in all the years of his employment. Although employer awarded options to husband in November 2002, April 2002, and February 2004, the numbers of shares  61,000 in the aggregate  and the option prices are far less favorable. Thus, the July 2002 options account for virtually all of the unvested stock option value in dispute in this appeal.
¶ 28. The family court did make findings about the situation in 2002:
The defendant received a substantial award of stock options during June 2002. At that time, BEA Systems and many other companies were recovering from a significant downturn in the technology stock market (a.k.a. "the dot com bust"), and were concerned about retaining employees whose stock options were now largely worthless (underwater). BEA's stock value had dropped from around $60 per share to under $10. They therefore issued new stock options with lower prices to the defendant and other key employees, in order to encourage them to remain there.
*31 These findings should be read in light of the court's earlier finding that stock options had become a significant and essential component of the compensation package for executives. Thus, they were being offered as an alternative to fixed salary for upper level employees. See DeJesus, 665 N.Y.S.2d 36, 687 N.E.2d at 1324 (one factor for apportionment is whether stock options are offered as an alternative to fixed salaries). For two years, the highest level employees in the company took a very large cut in compensation. When the economic situation of the company improved, the company restored the full compensation package. Based on these circumstances, the family court could reasonably find that the July 2002 options were really a make-up award for the employees maneuvering the company through the dot com bust to a profitable future.
¶ 29. The court could also consider wife's contribution in determining what was marital property as we discussed above. We think the court could consider this factor because of wife's post-divorce commitment to take care of the parties' disabled daughter even after the daughter reached the age of majority. The family court found that the daughter would always require significant adult supervision and would never be able to live on her own. As the family court found, wife's assumption of the role of caretaker for the disabled daughter is a "benefit to the defendant, and has enabled him to pursue his career without concern about Molly's welfare, and with very little direct involvement in her care." Central to the stock option issue is the fact that wife continued to assume that caretaking role after the divorce, and thus continued to contribute to husband's ability to put long hours into his career without having to participate in the care of the adult daughter.
¶ 30. Although factually somewhat different, we find comparable the decision of the Connecticut Supreme Court in Bornemann, 245 Conn. 508, 752 A.2d 978. In that case, husband received stock options as part of his hiring package, and they vested over a five year period. Id. at 982. However, husband was fired before the last two-fifths of the options vested in the fourth and fifth year. Id. The termination agreement allowed husband to still exercise the fourth and fifth year options as an employee as long as he abided by the terms of the termination agreement  for example, that he not obtain other employment that conflicted with the interests of the employer. Id. at 983. Meanwhile, husband and wife separated, and wife asserted that the unvested fourth and fifth year options were marital property. The superior court agreed, and the supreme court affirmed against husband's contention that the options were awarded for future performance of the termination agreement. Id. at 986-87.
¶ 31. The court found that stock options "are analogous to pension benefits in that they bestow a right upon the holder to receive a promised benefit under prescribed conditions." Id. at 985. It went on to hold that "[i]n determining when unvested stock options were earned, or will be earned, the purpose for which the options were granted must be considered." Id. at 987. Finally, it upheld the superior court finding as not clearly erroneous, concluding that the purpose of the stock option grant was to reward husband for past services "and that it was in exchange for those services that the defendant was paid his salary through December, 1996, and was offered the opportunity to retain the options." Id. at 991. In response to husband's argument that the court should have, at the least, used a time rule to apportion the options, the supreme court responded that because "we have already *32 determined that the options are marital property in their entirety, there is no need to employ a time rule in this case." Id. at 991 n. 11.
¶ 32. Because the family court's finding is not clearly erroneous, and the factor of wife's continuing contribution to husband's ability to remain productive and earn options supports the decision as to what is marital property, we affirm the family court's decision that all the unvested stock options are marital property. Although the court could have found, based on the evidence, that part of the purpose of the award of options was as compensation for future performance, we act under a limited standard of review that allows us to reverse only if findings are clearly erroneous based on the evidence. Mizzi, 2005 VT 120, ¶ 5, 179 Vt. 555, 889 A.2d 753. In reaching this conclusion, we stress that we are responding only to the issues raised by husband both below and on appeal. Husband has not challenged the sparseness of the court's findings and, although he sought use of a time rule, he failed to recognize that application of a time rule was only a secondary step to allocation based on the purpose of the stock option awards and the contribution of wife. Although he had the burden of proof, Baccanti, 752 N.E.2d at 730, he made no argument to the court as to how it could determine the purposes of the options and how it should allocate based on service. See id. at 731-32 (husband waived appeal issue where he argued only that unvested options were separate property and did not address allocation issue).
¶ 33. Looking at the family court's decision overall, we find it more than fair to husband. While stock options are an essential component of husband's compensation, the family court considered his future income as if he would not be awarded stock options in the future as he had in the past. As a result, the stock options in dispute represent only a relatively small part of husband's future compensation, and the bulk of that compensation will not be considered either in the property distribution or in the maintenance award. See n. 5 infra. To the extent there is unfairness in the overall result, it has disadvantaged wife and not husband.

C.
¶ 34. Next, husband claims the family court erred when it valued the unvested stock options for purposes of distribution because the unvested stock options are subject to forfeiture should he stop working for the company. He argues that the court can distribute the options only in kind without assigning a value to them.
¶ 35. At trial, both sides presented experts as to the valuation of the stock options, and both experts presented testimony on whether a value could be assigned with reasonable certainty. Based on the testimony, the family court concluded that all of the stock options could be valued, and further concluded that the parties actually "came close to an agreement on [the stock option] value," differing only by about $308,000. It adopted a valuation roughly in the middle of the values proffered by the expert witnesses, setting the value of all the options, vested and unvested, at $2,646,000. Based on that valuation, it split the transferable stock options, giving each party fifty percent. It left the incentive stock options, which cannot be transferred, with husband. In value terms, wife received options, both vested and unvested, worth $1,226,421, and husband received options, vested and unvested, worth $1,419,579. The value of the additional options awarded to husband was offset by additional property awarded to wife to reach a nearly exact fifty-fifty division of the marital assets. The court *33 noted, however, that the valuation of the nontransferable options was probably low because they receive more favorable capital gains tax treatment. Finally, the family court specifically declined to set up a trust, as the court did in Callahan, 361 A.2d at 563, to distribute the stock options because "such a vehicle would require these parties to continue to have contact and would also likely require the court to continue . . . supervision or involvement in these parties' affairs. This is not in anyone's interests."
¶ 36. We reject husband's contention that the family court erred in its valuation of the unvested stock options. The family court's basis for this valuation is well reasoned and based on adequate findings supported by evidence in the record. See Kanaan v. Kanaan, 163 Vt. 402, 405, 659 A.2d 128, 131 (1995) ("[W]e will uphold the court's valuation conclusions as long as they are supported by adequate findings, which are in turn supported by sufficient evidence in the record."); Chilkott v. Chilkott, 158 Vt. 193, 197, 607 A.2d 883, 885 (1992) (use of expert testimony to value a pension fund is the proper method). In fact, we have previously affirmed valuing property despite the existence of contingencies that, if not realized, would mean the property value could change in the future. See Chilkott, 158 Vt. at 197, 607 A.2d at 885 (trust interest); McDermott, 150 Vt. at 260, 552 A.2d at 788 (pension fund). Specifically, we have approved the valuation of pensions where the spouse, like husband here, must continue to work to be able to exercise the asset. See, e.g., McDermott, 150 Vt. at 260, 552 A.2d at 788. As we noted in Chilkott, even though the asset's value may be "contingent on the worker reaching retirement. [o]nce we accept the pension contingency, the contingencies in the instant case do not defeat the applicability of § 751(a)." Chilkott, 158 Vt. at 197, 607 A.2d at 885.
¶ 37. We also note in this case that the consequence of an incorrect valuation is relatively small. Except for the eight percent of the options awarded solely to husband because they were nontransferable, all other options were split equally between the parties so that the impact of a misvaluation was shared equally. See McDermott, 150 Vt. at 261, 552 A.2d at 789 (affirming trial court's method of property distribution where it "ensures that the parties share the risk of forfeiture through unemployment or death").
¶ 38. Finally, we note that other courts have addressed the issue of valuation and authorized valuation of unvested options despite the contingencies involved. See, e.g., Otley, 810 A.2d at 10-11. In Davidson, the court specifically endorsed the Black/Sholes method of valuing unvested options, the method used by wife's expert witness in this case. 578 N.W.2d at 858.
¶ 39. The family court specifically determined that the stock options could be valued, and that another method of distribution would be unworkable for the parties and the court. See McDermott, 150 Vt. at 260-61, 552 A.2d at 788 (affirming distribution method that promotes immediacy and finality). The court's decision to divide the property in order to reach an equitable distribution was well within its broad discretion to distribute property. See Cabot v. Cabot, 166 Vt. 485, 497, 697 A.2d 644, 652 (1997) (upholding family court's distribution and noting irrelevance of possible inaccuracy of net estate value where both parties would bear burden of inaccuracy and overall distribution would still be just); McDermott, 150 Vt. at 261, 552 A.2d at 789. We affirm its decision.

II. Date of Valuations
¶ 40. Husband's next argument is that the court erred by valuing the parties' *34 assets as of the beginning of the final hearing and ignoring evidence that those valuations had become inaccurate by the end of the final hearing. Specifically, husband argues that the court (1) ignored the fact that BEA Systems stock was dropping in value as the trial went on, and the drop affected the valuation of the stock options, and (2) ignored the distributions of money from a Merrill Lynch account that the court valued and distributed. In making these arguments, husband relies on the principle that the court should not "premise its division of marital property on outdated valuations of the assets involved" and that equitable division "cannot be achieved by reliance on stale valuation data." Cleverly v. Cleverly, 151 Vt. 351, 355, 561 A.2d 99, 101 (1989).
¶ 41. Husband made these arguments in his motion to reconsider, and the court responded as follows:
The defendant essentially argues that the court erred in making its findings as to the value of the marital assets based upon evidence presented at trial because those values fluctuated, as the experts for both sides conceded, from week to week during trial. However, the court has no realistic choice but to makes such findings, using its best judgment. The court does not agree that its figures were "stale." The court made its decisions based on its best judgment and based upon the evidence presented by both parties. The court is satisfied that, in the long term, the valuation used by the court will, when all aspects of the property division and valuation are taken into account, result in a just and equitable division between the parties.
The merits hearing in this case took eight trial days, spread over three months. In this context, constant updating of the value of assets is practically impossible. We agree that the court acted well within its discretion in its valuation and in denying the motion to modify.
¶ 42. Our precedents rejecting stale valuations involve time gaps between valuation of assets and the distribution of those assets far longer than is arguably involved here. Cleverly involves a gap of three years. Id. at 354, 561 A.2d at 101. In Albarelli v. Albarelli, 152 Vt. 46, 48, 564 A.2d 598, 599 (1989), we added that "marital assets should be valued as close to the date of trial as possible." The valuations in this case easily met the timeliness standards of our precedents.

III. Real Property
¶ 43. Husband and his brother Fraser own, as tenants in common, three lots of land in Putney, each with a building. One contains the marital homestead in which wife lives. Another contains a house in which Fraser lives. The third contains a cottage and barn. The evidence indicated that Fraser built his house and made substantial improvements to it thereafter. Because of that work, husband's evidence indicated that the brothers made an oral agreement that Fraser would own outright his house and the land on which it stands, and husband would own outright the third parcel with the cottage and barn. This oral agreement was not memorialized, and the record title reflects the ownership of all the lots as tenants in common.
¶ 44. Husband claims that grounds exist to reform the deed in equity to represent the oral agreement of the brothers, and that the family court erred when it refused to enforce the oral agreement. He further argues that Fraser owns the property based on adverse possession or quantum meruit. He argues that as a result, the value of his interest in the Putney property should be reduced by approximately $94,500.
*35 ¶ 45. The family court is a court of limited jurisdiction, 4 V.S.A. § 454, and that jurisdiction does not include reformation of deeds or determination of actions for adverse possession or quantum meruit between brothers. We recognize that husband does not actually want the family court to reform the deed, but instead to act as if it had been reformed. We find that procedure untenable. According to husband's argument, the family court would have to take the house and building occupied by Fraser out of the marital property, but husband could thereafter sell his half interest in the same property to a bona fide purchaser because the record title remains with him.
¶ 46. We are also concerned about burdening divorce proceedings with additional ancillary litigation that delays resolution of the divorce issues. See Ward v. Ward, 155 Vt. 242, 247, 583 A.2d 577, 581 (1990). This concern is hardly theoretical in a divorce proceeding as complex as this one and where wife contests husband's position both factually and legally. If husband believes that the record title does not represent the true ownership interests, he should have brought an action to reform the deeds in superior court. We hold that the family court properly acted within its discretion in determining husband's real property interests based on the record title.

IV. Custody and Maintenance Award
¶ 47. The family court has considerable discretion in ruling on maintenance, and the party seeking to overturn a maintenance award must show there is no reasonable basis to support the award to succeed on appeal. Sochin v. Sochin, 2004 VT 85, ¶ 10, 177 Vt. 540, 861 A.2d 1089 (mem.). Thus, this Court's review is limited to determining whether the family court's exercise of discretion was proper and whether a reasonable basis supports the award. See Kasser v. Kasser, 2006 VT 2, ¶ 16, 179 Vt. 259, 895 A.2d 134; Johnson v. Johnson, 155 Vt. 36, 40, 580 A.2d 503, 506 (1990).
¶ 48. Husband argues that the court made two errors in determining his annual income on which the maintenance and child support award was based. Generally, the family court concluded that husband's salary, including wages and bonuses but not including stock options, was $430,000 per year. It also concluded that husband will continue to be awarded stock options that would produce an income of roughly $60,000 annually,[5] creating a total income of $490,000. Husband claims first that the base amount is inconsistent with the evidence and the findings, and second, that the stock option income is speculative and represents "double dipping" on assets distributed as property. We begin with the first claim of error.
¶ 49. The court concluded that husband's "base salary as of the conclusion of the hearing was $300,000 per year." The court further found that since husband's employment with BEA Systems, he has received both bonuses and stock options in addition to his base salary, and the base salary increased each year of his employment. The court found that husband "had the potential to receive additional bonuses *36 each year of 30% of base pay, and then from November 2001 to the present, he has had the potential to receive bonuses of up to 60% of his base pay." Although the court calculated that husband's average annual bonus from January 2000 through May 2004 was only $76,492, it also found that "[h]is bonuses have shown a trend of significant increases each year." In fact, it found that should husband reach his potential of a bonus at the rate of sixty percent of his current base pay, "this would amount to $180,000 in additional wages." Considering husband's increasing base salary and the increasing amount of bonuses, the court concluded that husband's annual income, excluding that from stock options, is $430,000.
¶ 50. The family court's finding of husband's annual salary at $430,000 is fully supported by the record. The court was not required to use either the average of prior bonus awards or the current base salary to determine husband's future income given the history of increases in both amounts. We find that the court's income determination, apart from the stock option income, was within its discretion. See Kohut v. Kohut, 164 Vt. 40, 44, 663 A.2d 942, 945 (1995) (court could determine obligor's future income in part on his begining a new job that would produce a better income).
¶ 51. We have already discussed the court's determination that husband would earn $60,000 annually on the sale of stock options, as well as our conclusion that this determination was low. We address here only husband's arguments that the court "double dipped" by counting the options as both assets and income, and that the court prematurely counted the income from future stock option awards.
¶ 52. As we said above, the court appeared to derive the $60,000 additional annual income from future stock option awards. Since the stock options had not yet been provided to husband, and were not part of the property distribution, his "double dipping" argument does not apply.
¶ 53. We add, however, that husband's "double dipping" argument is erroneous. In making it, he relies on a case that defined capital gains for child support purposes to ensure that obligors in similar circumstances were treated equally. See Mabee v. Mabee, 159 Vt. 282, 286, 617 A.2d 162, 164 (1992) (holding that capital gain resulting from appreciation in value of property received in asset distribution could not also be considered income for child support obligation). The situation is totally different here. Husband was awarded stock options worth over $1,400,000, many of which were vested, and it is reasonable to expect that these assets will earn income. This income must be considered in determining an appropriate maintenance award. See 15 V.S.A. § 752(b)(6). Indeed, the family court considered the availability of income from the assets awarded to wife in determining her need for maintenance.
¶ 54. Husband's other argument is that future awards of stock options cannot be considered income because, as the court found, there will be at least a year delay in husband's ability to exercise these options. This argument calls for a fine tuning of maintenance awards that is unrealistic and would keep the parties in court forever. As the court found, stock options were a normal part of husband's compensation package, and he received them on a regular basis. At the conclusion of the divorce proceeding, he was holding options worth over $1,400,000. It is reasonable to assume that he would generate at least $60,000 in income from these options in the short term while the stream of income from future awards was reestablished. See Hiett v. Hiett, 86 Ark.App. 31, 158 *37 S.W.3d 720, 724 (2004) (stock options anticipated in the future represent income for purposes of setting an alimony level).

V. Changed Circumstances
¶ 55. This case comes to us after the consolidation of two separate appeals. The first, considered above, involves the original divorce order. The second, considered here, involves the denial of husband's subsequent motion to modify his child support and spousal maintenance obligations based on allegedly changed circumstances. Husband made the motion to modify on March 5, 2005, only three months after the original divorce decree was issued and less than two months after the denial of his motion to modify and amend the divorce order. While the grounds were extensive, they rely on two central points: (1) husband's income decreased from $490,000  the court's finding as to his income  to $353,500, and (2) his eldest son, Jonathan, made an "unanticipated permanent move to California" greatly increasing his expenses and reducing wife's expenses. He argued that either or both of these grounds constitute a real, substantial, and unanticipated change of circumstances sufficient to modify the maintenance and child support orders.
¶ 56. In a brief order issued on April 6, 2005, after a hearing, the court denied the motion ruling:
The allegations in these motions consist almost entirely of challenges to the court's findings of fact in the divorce decree. These issues are to be resolved on appeal. The balance of the motion consists largely of allegations regarding facts that could have been presented at trial (e.g. the reasonably anticipated expenses related to Jonathan's relocation), or that are very far from being unanticipated or substantial in nature. The defendant has failed to meet his burden of alleging a real, substantial, and unanticipated change in material circumstances since the issuance of the court's final order.
Husband's argument on appeal is that the decrease in income and increase in expenses constitute unanticipated changes in circumstances as a matter of law.
¶ 57. The family court may modify a child support or spousal maintenance order only upon a showing of real, substantial, and unanticipated change of circumstances. 15 V.S.A. § 660(a) (child support); id. § 758 (spousal maintenance). A change in circumstances is a jurisdictional prerequisite to such modifications, Harris v. Harris, 168 Vt. 13, 17, 714 A.2d 626, 629 (1998), and the burden is on the moving party to establish the requisite change, Habecker v. Giard, 2003 VT 18, ¶ 5, 175 Vt. 489, 820 A.2d 215 (mem.). "There are no fixed standards for determining what meets this threshold," and we must evaluate whether a given change is substantial "in the context of the surrounding circumstances." Taylor v. Taylor, 175 Vt. 32, 36, 819 A.2d 684, 688 (2002). The ruling is discretionary so we will not reverse a decision on whether the threshold has been met unless the court's discretion "was erroneously exercised, or was exercised upon unfounded considerations or to an extent clearly unreasonable in light of the evidence." Id. (citation omitted).
¶ 58. The main grounds for the denial of the motion were that husband was trying to relitigate decisions made in the divorce decision and that he moved too soon to establish that circumstances had changed with respect to his income or expenses. In addition, the court found that the expenses for Jonathan were or should have been anticipated by the time of the divorce hearing. Indeed, the divorce decision stated that the parties had concluded that Jonathan, who was sixteen *38 years old at the time of the decision, "would spend this school year (2004-2005) in San Francisco, living with the defendant and attending a day school there" and that costs of schooling and child care for Jonathan "must be adjusted for the fact that [husband] is now paying Jonathan's costs."
¶ 59. We recognize that, in circumstances where an obligor achieves a substantially lower income than the projection upon which a maintenance order is based, the family court can find changed circumstances. See Stickney v. Stickney, 170 Vt. 547, 548, 742 A.2d 1228, 1231 (1999) (mem.). This does not mean, however, that the court must find changed circumstances if the obligor's income is underperforming the projection three months after the maintenance order is issued. This case demonstrates why a family court could require the obligor to show underperformance over a substantial period of time to justify a downward modification in child support or maintenance. Husband's income history showed great volatility from year to year, but on average husband earned far more than the income figure on which the court set the maintenance and child support awards. The court acted well within its discretion to rule that husband's proffer of reduced income was more a challenge to the divorce decision than a demonstration of changed circumstances and, as a demonstration of changed circumstances, was inadequate. Similarly, we affirm the family court's decision that the additional expenses for Jonathan were not unanticipated and should have been shown at the divorce hearing.
¶ 60. Finally, we consider wife's cross-appeal claims. Wife cross-appealed from the original divorce decision raising three issues, but added in her brief that she would waive consideration of the cross-appeal issues if the divorce judgment were affirmed in response to husband's claims on appeal. We have rejected husband's claims on appeal and have affirmed the divorce decision as well as the rulings on the post-judgment motions. Thus, in accordance with wife's contingent waiver, we dismiss her cross-appeal.
Affirmed.
NOTES
[1] Husband has assumed that the court's finding that "all . . . [the options] were attributable to his work during the marriage" is a conclusion of law and argues that it is inconsistent with the court's findings. By the court's findings, husband means the summary of the evidence, which does not constitute findings as we noted in the text. We have treated husband's argument as if he were arguing that the court's finding on this point is clearly erroneous.
[2] We recognize that this theory might support a conclusion that some part of options granted after the dissolution of the marriage are marital property. We are not going that far in this case. There is also an issue, as discussed infra, whether options awarded in the future are better considered either as income or as income-producing property in the determination of maintenance and child support.
[3] Consistent with our analysis above, we have substituted the date of the final hearing for the date of separation  the date proposed by husband.
[4] In some states, the applicable formula must exclude any stock option that vested prior to the marriage and any portion of an unvested option that reflects compensation for work prior to the marriage. Thus, Davidson suggests three formulae depending on the circumstances. 578 N.W.2d at 857. Under 15 V.S.A. § 751(a), marital property includes property brought into the marriage by either spouse. See Colm v. Colm, 137 Vt. 487, 490-91, 407 A.2d 184, 186 (1979).
[5] Although the family court did not specify how it derived this figure, we infer that it represents the interest on the first year of stock options awarded to husband under the property distribution. This figure ignores the future vesting of stock options pursuant to awards made prior to the final hearing and, more important, assumes that husband will never receive future stock options, an assumption at variance with the facts found by the court. If anything, the family court undervalued the income from husband's stock option stream.